WILLIAM M. DONALD et al.

*v.*

AMERICAN SMELTING AND REFINING COMPANY et al.

[Argued March 4th and 5th, 1901. Decided March 11th, 1901.
Filed March 13th, 1901.]

Revision of 1896 (*P. L. of 1896 p. 293 § 49*) provides that any corpo-
ration formed under the act may purchase property and issue stock to the
amount of the value of the property, and, in the absence of actual fraud,
the judgment of the directors as to the value of the property purchased
shall be conclusive. A corporation capitalized for $65,000,000 issued
stock to the amount of $54,800,000 which was fully paid. It had earned
eight per cent. on the par value of the stock, and proposed to increase
its capital to $100,000,000 and to issue $45,200,000 of stock for property
of a competing company, the owners of which were to put in $12,000,000
in cash. There was evidence that the property was not worth over
$10,000,000, but when the arrangement became known, defendants' com-
mon stock rose from forty-one to sixty-three, and the preferred from
ninety-one to ninety-nine and one-half. The business of the company
sought to be amalgamated was prosperous, and the company possessed
a world-wide and valuable reputation.—*Held*, that the consolidation would
not be enjoined at the suit of a stockholder, since the evidence did not
show that there was conscious overvaluation of the property by the
directors of the smelting company.

On bill.

*Mr. Richard V. Lindabury,* and *Mr. Lauterbach* (of the New
York bar), for the complainants.

*Mr. William H. Corbin, Mr. Robert H. McCarter, Mr.
Thatcher* and *Mr. Untermeyer* (of the New York bar), for the
defendants.

STEVENS, V. C.

This is an application for a preliminary injunction to restrain
the American Smelting and Refining Company from increasing
its capital stock from $65,000,000 to $100,000,000, and to

Donald *v.* American Smelting and Refining Co.

restrain the directors of the company from purchasing the plants of M. Guggenheim's Sons, for its capital stock at par, to the amount of $45,200,000.

The injunction is asked for on two grounds. The first ground is, that as part of the agreement for such purchase it was arranged that of the stock to be issued to M. Guggenheim's Sons, over five million dollars of common and five million dollars of preferred were to be turned back presently to the different members of the board of directors, or to a majority of them, at the price of eighty cents on the dollar for the preferred and fifty cents on the dollar for the common stock.

The second ground is that the smelting and refining plants of M. Guggenheim's Sons, including their mining leases and contracts, are not worth more than ten millions of dollars; and that conceding that by the terms of the agreement, they will, in addition, be obliged to pay twelve millions in cash, the total ($22,000,000) is not a full equivalent for the $45,200,000 of stock to be issued to them; this equivalent being required by section 49 of the Corporation act, which authorizes the purchase of mines, manufactories, &c., and the issuing of stock "to the amount of the value thereof, in payment therefor."

It is admitted that the first ground of complaint has not been established; and I shall, therefore, confine myself to a discussion of the second. Before doing so, I will state what I understand to be the legal rule. So many changes have been made in the statutes applicable, that it may be well briefly to mention them. The first act is that of 1846. It authorizes the establishment of manufacturing companies, and provides in section 27 (*P. L. of 1846 p. 69*) that

"no note or obligation given by any stockholder whether secured by any pledge or otherwise shall be considered as payment of any part of the capital stock."

The same provision is contained in the act of 1849. *P. L. of 1849 p. 306 § 26.* It continued unchanged until the revision of 1875, when the act quoted was, greatly changed, transferred to the Corporation act, in which it appears as section 54. *Rev. Stat. p. 186.* It there reads:

"Nothing but money shall be considered as payment of any part of the capital stock * * * except as hereinafter provided, for the purchase of property."

Then follows a new section (section 55) as follows:

"The directors of any company incorporated under this act may purchase mines, manufactories or other property necessary for their business *and issue stock to the amount of the value thereof*, in payment therefor, and the stock so issued shall be declared and taken to be full paid stock; neither shall the holder thereof be liable for any further payments under any of the provisions of this act, and said stock shall have legibly stamped upon the face thereof the words 'issued for property purchased.' "

It was these provisions that were in force when *Wetherbee* v. *Baker, 8 Stew. Eq. 502,* was before the court of errors, although the court in that case was not called upon to construe them, but the somewhat analogous, though less explicit provision, contained in section 3 of the Land Improvement act (*Rev. Stat. p. 568*), which provided that the payment of capital stock

"shall be made either in money or in land * * * the land to be appraised by the board of directors and taken at such value by the said company, on such terms as may be agreed upon."

Notwithstanding that the price appeared to be left entirely to the judgment of the directors, it was held in that case that the rule applicable was

"that payment of stock subscriptions is good as against creditors only where payment has been made in money or what may fairly be considered as money's worth."

If this was the rule in cases arising under the Land act, *a fortiori,* would it apply to cases arising under the Corporation act of 1875, for this latter act, in plain terms, required a full equivalent in property for the stock to be issued for it; and such was the construction put upon it by Vice-Chancellor Green in *Edgerton* v. *Electric Co., 5 Dick. Ch. Rep. 354, 361.*

In 1889 the act of 1875 (*P. L. of 1889 p. 414*) was broadened by adding to the things that might be purchased, "the stock of

any other company or companies owning, mining, manufacturing or producing materials."

Then came the revision of 1896, section 49 of which reads as follows:

"Any corporation formed under this act may purchase mines, manufactories or other property necessary for its business, or the stock of any company or companies owning, mining, manufacturing or producing materials, or other property necessary for its business, and issue stock *to the amount of the value thereof* in payment therefor, and the stock so issued shall be full paid stock and not liable to any further call, neither shall the holder thereof be liable for any further payment under any of the provisions of this act; and in the absence of actual fraud in the transaction, the judgment of the directors as to the value of the property purchased shall be conclusive."

This is the section under which the present controversy arises. It will be seen that it differs from the act of 1875 in omitting the requirement that the stock be stamped "issued for property purchased," and in providing that in the absence of actual fraud, the judgment of the directors as to value should be conclusive.

It is somewhat singular that our courts have not been called upon to apply these various statutory provisions more frequently. In New York, however, the decisions upon a provision of a statute almost identical with that already mentioned in the act of 1875, are numerous and will throw much light upon what is to be deemed "actual fraud."

Among the cases referred to in *Wetherbee* v. *Baker, 8 Stew. Eq. 513,* is *Boynton* v. *Hatch, 47 N. Y. 225.* That was a creditor's suit brought against a stockholder to make him liable for two judgments recovered against the Empire Moulding Company, on the ground that the stock was not paid in. Evidence was given as to the value of the property, in payment for which the stock had been issued. The referee excluded it as immaterial. On the appeal, the question was whether he had rightly excluded it. Mr. Justice Grover held that the price agreed upon was only *prima facie* evidence of the value of the property and that the real question was, what was its actual value? Mr. Justice Allen, on the other hand, was of opinion that the real question was whether the act of the directors in purchasing the

property and issuing the stock for it was a fraud upon the law—that is, whether it was a mere evasion of the statute which authorized stock to be issued only to the amount of the value of the property purchased. Two of the judges concurred with Judge Grover and two with Judge Allen. They all agreed, however, that the referee was wrong in excluding evidence of value, as, in any view, *actual* value was a material element in the proof.

Judge Allen's opinion subsequently prevailed. In *Douglas* v. *Ireland, 73 N. Y. 102,* after saying that the transaction may be impeached for fraud, but not for error of judgment in the valuation, the same judge says, "all that is necessary to establish the legal fraud [*i. e.,* the fraud upon the law] * * * is to prove two facts—*first,* that the stock issued exceeded in amount the value of the property, in exchange for which it was issued; *second,* that the trustees deliberately and with knowledge of the real value of the property overvalued it and paid in stock for it, an amount which they knew was in excess of its actual value;" and then he goes on to say that the value must be determined upon the evidence, having respect to the circumstances of the case and the nature of the property, and that "the *scienter* and guilty action of the trustees may be either proved directly or inferred from circumstances." In that case it was held that the circumstances were such as to warrant the inference of fraud; and fraud was also deemed to have been proved in *Boynton* v. *Andrews, 63 N. Y. 93,* and in *N. T. W. Co.* v. *Gilfillan, 124 N. Y. 302,* while in *Lake Superior Iron Co.* v. *Drexel, 90 N. Y. 88,* the court allowed a verdict for the defendant to stand, although on the question of fact it would itself, apparently, have come to a different conclusion, and in *Gamble* v. *Q. C. W. Co., 123 N. Y. 93,* there was a reversal because the trial judge had excluded from consideration some of those elements of value in the works purchased, which tended to make the price reasonable.

In *Bickley* v. *Schlag, 1 Dick. Ch. Rep. 534,* the finding of the trial court was "that the amount of stock issued by the company was of the value of $75,000, but that only $64,000 worth was paid for it, so that $15,500 worth of stock remained

unpaid for; for that the stockholders are still liable." This finding was evidently based upon the view of the law entertained by Judge Grover, to which I have before adverted. It was, as I understand, repudiated by the court of errors in the following language: "In view of the proofs in the case, it was not and could not be disputed that the stock in question, as between these stockholders and the corporation, had been paid for in full; for they had transferred to the company, in satisfaction for it, certain steamboats and other property, each share so purchased being marked with the words 'issued for property purchased.' Consequently so long as this contract of sale subsisted, an indisputable title to the stock existed in the stockholders, and it was also thereby conclusively established that they were in nowise indebted to the company by reason of their purchase. The inquiry, therefore, in the court below should have been, whether the agreement in question was fraudulent or not; for if the transaction was an honest one, the difference in value between the property constituting the consideration of the sale and the stock had no legal significance."

Now it is quite apparent that the intention of the revisers of the act of 1896 was to put in statutory form the result of this prior course of adjudication. The fraud referred to in the forty-ninth section is fraud upon the law; and in the words of Mr. Justice Allen, in *Douglas* v. *Ireland, supra,* no other fraudulent intent need be proved "than that which is evidenced by the act of *knowingly* issuing stock for property in excess of its value." It must be remembered, however, that a wide discretion in the matter of valuation, as in other matters, is confided to directors. As long as "they act in good faith, with honest motives, for honest ends," the exercise of their discretion will not be interfered with. "Courts of equity," says Mr. Thompson in his work on *Corporations* § *4518,*

"cannot be called upon to control the discretion of the managing bodies of corporations. Otherwise they would be choked with applications of recalcitrant stockholders. The action of a board of directors may be ill-advised or apparently unprofitable, but this furnishes no ground for invoking the restraining powers of the court."

Donald *v.* American Smelting and Refining Co.

Given *bona fides* and the court will not put *its* opinion as to values against theirs. The test will be conscious overvaluation and not ill-advised action.

In nearly all the cases above cited, it was the creditors who brought the suit, after the purchase had been consummated. In the case in hand, it is stockholders who are seeking to enjoin the purchase *in limine.* It seems to me clear that in the situation here presented, these stockholders have a right to ask the court to interfere for their protection. Presumably they have paid either money or money's worth for their stock, and if the contemplated issue is for property at an overvaluation, the inevitable result will be to lessen their proportionate shares or interests in the entire property. Besides they have a right to insist that their property shall be managed in conformity with the law.

I now come to the facts. The smelting company was incorporated under the laws of this state in April, 1899. Its authorized capital stock was $65,000,000, of which $54,800,000 has been issued. It is proposed to increase this stock to $100,000,000 and to issue to M. Guggenheim's Sons $45,200,000, one-half common and one-half preferred. It is not denied that on the basis of relative values, the combination of the two interests, in this manner, is a fair one. The fact is that when, in December last, it became known that the arrangement had been made, the preferred stock of the smelting company, already issued, rose from ninety-one to ninety-nine and one-half, and the common from forty-one to sixty-three. If, then, the smelting company's property is worth the par value of its outstanding stock ($54,800,000), the property of the Guggenheims would appear to be worth the amount at par of the stock to be issued to them.

It is contended, however, that the smelting company's property is not worth $54,800,000. It is no doubt true that some companies have issued stock for property purchased far in excess of its actual value, but it is also true that others have, in this regard, strictly conformed to the law. Of course, in determining the present case I cannot resort to conjecture. The pleadings and *ex parte* affidavits must be my sole guide.

The bill alleges that all the stock that has been issued by the

smelting company is fully paid. What am I to understand by this? The foregoing discussion shows that what I am to understand is this—that for all the stock issued, money's worth—that is, a full equivalent, has been received. Hence I must take it to be a fact (for the bill alleges it and the answer admits it) that in April, 1899, this company acquired property then worth $54,800,000. But the bill further alleges, in paragraph 7, that on January 1st, 1901, the company had no working capital, and that its capital had become impaired—to what extent is not stated. The bill, in this particular, is verified only on belief. The answer denies this allegation, and avers that, at the date named, the capital was unimpaired, and that it now has a working capital of $9,000,000. Mr. Nash, the president, swears that the net working capital has been largely increased by profits, although, out of earnings, over three millions have been expended to discharge mortgage liens and to pay for construction.

It is also sworn to that the net earnings for the year ending October 31st, 1900, were $4,378,000; in other words, about eight per cent. of the par value of all the stock. Now, on these facts, practically undisputed, I certainly cannot conclude that the smelting company's stock does not fairly represent the value of its property. But it is said that Mr. Guggenheim's affidavit shows that prior to December last the preferred stock was selling for ninety-one cents on the dollar and the common for forty-one, and that this is proof of what the property is really worth. Undoubtedly the market price of stock is some evidence of value, and often satisfactory evidence; but Mr. Untermeyer argued, and not without force, that investors are apt to look with some degree of doubt or suspicion upon a new industrial undertaking, and to manifest an unwillingness to take the stock at its real value until time has demonstrated the company's stability and earning power, and he argued further that the stock of this very company which, in December, sold for ninety for the preferred and forty for the common, in the month following sold for ninety-nine and one-half and sixty-three, thus showing how uncertain an indication of the value of this particular property the market price of this stock is. Taking all the foregoing facts together, I cannot say that it is proved to my satisfaction that

30

the property of the smelting company is not worth $54,800,000, and that consequently, on the basis of relative values, the Guggenheim property is not worth $45,200,000. But in view of the rule of law, as I have found it to be, this is not the whole question. I must be able to say, not only that I do not think the smelting company's property, and consequently the Guggenheim property, is not worth the sum named, but that the directors, in the *bona fide* exercise of their discretion, could not think so; that having consciously overvalued these properties, they resorted to the device of relative valuation to cover up what they knew. Of course, on the proofs as they now stand, such a finding is impossible.

But the complainants put their argument in another way. They say it is shown that the various plants controlled by the Guggenheims are not worth more than from eight to ten millions, and that the cash which they are to contribute does not exceed twelve millions. For this twenty or twenty-two millions they are to receive, it is said, fifty-four millions. But this leaves out of view the good will of the Guggenheim business, the contracts and leases connected with it, the saving in freights, their business connections in both hemispheres, the getting rid of a competitor—a legitimate item of value, according to the cases (*Rural Homestead Co.* v. *Wildes, 9 Dick. Ch. Rep. 668; Gamble* v. *Q. C. W. Co., supra*), and several other considerations mentioned in the affidavit of Mr. Nash. It may be that all of these together, and, in addition, the earning capacity of the property (which for the year ending October 31st, 1900, is stated to have been $3,216,406.88 net), do not make up a value of $24,000,000, but inasmuch as the directors assert that they do, it is for the complainants to show, not only that they do not, but that these directors cannot honestly entertain that opinion.

If directors should purchase a thousand tons of coal, and issue full-paid stock for it at the rate of $6 a ton, while coal of the same kind could be bought in the market by anyone for $4, it would be easy for the court to say that their discretion was not honestly exercised; that they must have known that they were paying for it more than it was worth. In such a case, *res ipsa loquitur.* But where there is a vast property like the present,

having so many elements of value outside of mere material substance, and not capable of estimation, except by experts, how, on the proofs as they stand, can I say that these directors have consciously disregarded the law? Much stress was laid upon the statement near the end of Mr. Guggenheim's affidavit that he intends to secure the additional working capital which he is to contribute by sales of part of the stock coming to him. If he had bound himself to sell this stock, or any part of it, at a definite sum, less than par, there would be much force in the argument; but he did not, and so, as the case stands, there is nothing in the arrangement itself to show that either Mr. Guggenheim or the directors dealt with the stock on the basis of less than its par value.

I think the injunction should be denied.