JONES et al. v. MISSOURI–EDISON ELECTRIC CO. et al.

(Circuit Court of Appeals, Eighth Circuit. July 22, 1912.)

No. 3,624.

CORPORATIONS (§ 584*)—CONSOLIDATION—BREACH OF TRUST BY MAJORITY STOCKHOLDERS—RIGHTS OF MINORITY TO EQUITABLE RELIEF.

The distribution of the stock of an electric company, formed by the consolidation of two companies, between the stockholders of the constituent companies, *held* so unjust and unequal as to amount to a breach of trust and a fraud on the minority stockholders of one of the companies by the majority stockholders, who were also sole stockholders of the other and favored company, and to entitle such minority stockholders to relief in equity.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2343–2347; Dec. Dig. § 584.*

Rights of minority stockholders as to management of corporate affairs, see note to Wheeler v. Abilene Nat. Bank Bldg. Co., 89 C. C. A. 482.]

Appeal from the Circuit Court of the United States for the Eastern District of Missouri.

Suit in equity by Morgan Jones and others against the Missouri-Edison Electric Company and others. Decree for defendants, and complainants appeal. Reversed.

Eleneious Smith, D. T. Bomar, and Ford W. Thompson (Robert & Robert and W. B. Thompson, on the brief), for appellants.

R. E. Rombauer and Henry S. Priest (Edgar R. Rombauer, on the brief), for appellees.

Before SANBORN and HOOK, Circuit Judges, and WM. H. MUNGER, District Judge.

WM. H. MUNGER, District Judge. This action was brought by appellants, as stockholders of the Missouri-Edison Electric Company, to have set aside and declared illegal a consolidation of the Missouri-Edison Electric Company, hereinafter designated "Edison Company," with the Union Electric Light & Power Company, hereinafter designated as "Union Company No. 1," into the Union Electric Light & Power Company, hereinafter designated "Union Company No. 2." A bill was filed, alleging that the consolidation was illegal and fraudulent for the reasons: (1) That it was unauthorized by the statutes of Missouri; (2) that the consolidation was prohibited by the anti-trust laws of that state; (3) that the facts under which the consolidation was made show a

breach of trust and fraudulent action on the part of the majority stockholders. The bill prayed that the consolidation be declared illegal and void, and that the property of the Edison Company be restored to it, for an accounting of earnings, or that the value of appellants' stock be ascertained, that the amount when so ascertained be declared a lien upon all the property and assets of the Missouri-Edison Company and said Union Company No. 2, and payment of the amount be decreed to them. A demurrer was filed to the bill, which was sustained. On appeal to this court that judgment was reversed. Jones v. Missouri-Edison Electric Co., 144 Fed. 765, 75 C. C. A. 631.

A full statement of all of the facts alleged in the bill is given in that case, and it is only necessary for the purposes of this case to state that Union Company No. 1 was formed by a consolidation of the Imperial Electric Light, Heat & Power Company, which will be hereinafter designated as "Imperial Company," and the Citizens' Electric Light & Power Company, hereinafter designated as "Citizens' Company." The consolidation between the Imperial Company and the Citizens' Company took place in May, 1902. The assets of the Citizens' Company consisted of certain franchises, underground conduits, and a tract of land purchased for a power site, which will be hereinafter designated as the "Ashley street plant." The Citizens' Company was owned by a syndicate of 20 gentlemen. The North American Company was a stockholding company, owning the stock of numerous electric light and power plants over the country, and owned all of the stock of the Imperial Company. Soon after the consolidation of the Imperial Company and Citizens' Company into Union Company No. 1, the North American Company and the Citizens' Syndicate conceived the idea of procuring a majority of the stock of the Missouri-Edison Company and consolidating that company with Union Company No. 1. Such consolidation was effected by action of the majority of the stockholders of the two companies in September, 1903. Appellants protested and objected to such consolidation. Being overruled, this action was brought.

After the case was remanded by this court, issues were joined and the cause referred to a master, who took the evidence and made specific findings, with the general finding that the consolidation was fairly entered into and the stockholders of the Missouri-Edison Company were given a fair proportion of the stock of Union Company No. 2 for their stock in the Missouri-Edison Company. Exceptions to the report of the master were overruled, his report confirmed, and the bill dismissed, from which this appeal has been taken.

In determining whether appellants are entitled under the facts to relief, we lay aside a consideration of the question as to whether the consolidation was in violation of the anti-trust laws of the state of Missouri, or in violation of the laws of that state relative to the consolidation of two or more corporations. When the case was

before this court on demurrer to the bill (144 Fed. 765, 75 C. C. A. 631), in the opinion then rendered it was said:

"The fraud or breach of trust of one who occupies a fiduciary relation while in the exercise of a lawful power is as fatal in equity to the resultant act or contract as the absence of the power. The relation of a stockholder to his corporation, to its officers and to his co-stockholders is a relation of trust and confidence. * * * A combination of the holders of a majority or of three-fifths of the stock of a corporation to elect directors, to dictate their acts and the acts of the corporation for the purpose of carrying out a predetermined plan, places the holders of such stock in the shoes of the corporation, and constitutes them actual, if not technical, trustees for the holders of the minority of the stock. * * * Such a majority of the holders of stock owe to the minority the duty to exercise good faith, care, and diligence to make the property of the corporation in their charge produce the largest possible amount, to protect the interests of the holders of the minority of the stock, and to secure and deliver to them their just proportion of the income and of the proceeds of the property. Any sale of the corporate property to themselves, any disposition by them of the corporation or of its property to deprive the minority holders of their just share of it, or to get gain for themselves at the expense of the holders of the minority of the stock, becomes a breach of duty and of trust, which invokes plenary relief from a court of chancery."

The applicability of the foregoing rule of law to the case in hand will be seen by a consideration of certain facts disclosed by· the evidence.

The Imperial Company was actively engaged in the business of manufacturing and vending electricity in 1901, when it was purchased by the North American Company, subject to an indebtedness of $1,552,000, for the sum of $700,000. The Citizens' Company was not an active concern. Its assets consisted of certain underground conduits, which cost $200,000 a contract right to string wires upon the poles of the Kinloch Telephone Company, and the Ashley street property, purchased at the sum of $100,000, and a contract with the General Electric Company, which granted to it the exclusive right to use the patented electric apparatus within the city of St. Louis manufactured by that company. Its capital stock of $750,000 was issued as paid-up stock, based upon said contract with the General Electric Company. For the purpose of constructing the conduit system, the Syndicate entered into a contract with one of its members, who described himself as trustee, whereby it agreed to pay him for constructing the conduit system and acquiring the pole rights $1,250,000 par value of stock and $525,000 par value of bonds, and the stock of the Citizens' Company was increased to $2,000,000. This contract was really one by the Citizens' Syndicate with itself. An issue of $2,000,000 bonds was authorized, and for the purpose of constructing the Ashley street plant the Syndicate agreed to purchase $1,100,000 par value bonds of the company at 90 cents on the dollar. These bonds were never issued, but the agreement of the Citizens' Syndicate was used as collateral, upon which money was procured; the amount not being disclosed by the evidence.

Such was the situation· when, in May, 1902, the consolidation took place between the Imperial Company, owned by the North

American Company, and the Citizens' Company, owned by the Citizens' Syndicate, which consolidation was on the basis of the Imperial Company being turned in subject to its indebtedness of $1,552,000 as equal in value to the property of the Citizens' Company. This new consolidated company, Union Company No. 1, organized with a capital of $2,000,000 preferred stock, $8,000,000 of common stock, and authorized an issue of $10,000,000 of bonds, secured by a mortgage or deed of trust of date September 1, 1902. To the Citizens' Syndicate was issued $1,000,000 par value of the preferred and $350,000 of the common stock of the consolidated company, and to the North American Company a like amount in lieu of the stock held by the Citizens' Syndicate in the Citizens' Company and the stock held by the North American Company in the Imperial. Company, and it was agreed that the North American Company would subscribe for and take $2,000,000 of the authorized issue of bonds, and the Citizens' Syndicate would subscribe for and take $2,000,000, such bonds to be taken at 97 cents on the dollar, the $1,100,000 of bonds which the Citizens' Syndicate had subscribed for and agreed to take to be deducted from the $2,000,000. In this manner the indebtedness of the Citizens' Company, resulting from the promise of the Syndicate to subscribe for the $1,100,000 of its bonds, was paid by Union Company No. 1; $2,000,000 of the common stock was issued to the Citizens' Syndicate as a bonus for their subscription to the $2,000,000 of bonds, and $2,000,000 of common stock was issued to the North American Company as a bonus for its subscription to the $2,000,000 of the bonds; and $3,300,000 of the common stock remained in the hands of trustees of the new company as treasury stock.

Immediately after this consolidation steps were taken by the North American Company and the Citizens' Syndicate to obtain a majority of the stock of the Missouri-Edison Company. This was desirable, as the Missouri-Edison Company was in active operation in the manufacture and sale of electricity, and was the only substantial competitor in the city, and by acquirement of it active competition would be throttled. The North American Company and the Syndicate thereupon agreed that they would acquire a majority of the stock of the Missouri-Edison Company and consolidate it with Union Company No. 1. They proceeded to do so, and early in the year 1903 acquired a majority of the stock and agreed upon terms of consolidation. Being unable to negotiate the $10,000,000 of authorized issue of bonds of Union Company No. 1, except the $4,000,000 subscribed for by the North American Company and the Citizens' Syndicate, unless the mortgage also included the property of the Missouri-Edison Company, and then being the owners of a majority of the stock of that company, they, on June 19, 1903, gave a supplemental mortgage covering the property of the Missouri-Edison Company, to secure the $10,000,000 issue of bonds. That mortgage recited the contemplated consolidation of Union Company No. 1 with the Missouri-Edison Company. The mortgage of September 1, 1902, provided that, out of

the issue of $10,000,000 of bonds, $1,552,000 was to be used in the payment of the indebtedness of the Imperial Company, and $2,-448,000 of the bonds were to be used to pay for such betterments, construction work, and purchases as Union Company No. 1 should make. It was not until after the giving of the supplemental mortgage before mentioned that Union Company No. 1 was enabled to negotiate its $10,000,000 of bond issue, except the $4,000,000 above stated. Thus it will be seen that the property of the Missouri-Edison Company was pledged as security June 19, 1903, to secure the funds which paid off the indebtedness of the Imperial Company, which had been assumed by Union Company No. 1, and to secure the funds with which the Ashley plant was completed. The Ashley plant was not completed and a going concern until some time during the year 1904.

Immediately after the giving of the supplemental mortgage, notice was given of a meeting of the stockholders of Missouri-Edison Company, to be held September 9, 1903, for the purpose of perfecting the consolidation. Appellants applied to the officers of the company for information as to the terms of the contemplated consolidation, the information was refused them, and they did not know the proposed terms until the meeting at which the consolidation took place. The consolidation of Union Company No. 1 and the Missouri-Edison Company resulted in the formation of Union Company No. 2, with a capital stock of $10,000,000 divided into 100,000 shares of $100 each, and the distribution of its stock by the agreement of consolidation was: For the stock of the Edison Company, one share of Union Company No. 2 and $5 for every two shares of Edison preferred stock and one share of Union Company No. 2 stock and $5 for every four shares of Edison common stock. For the stock of Union Company No. 1, one share of Union Company No. 2 for each share of the preferred and one share of Union Company No. 2 for every two shares of the common stock of Union Company No. 1. The remaining $2,500,000 stock of Union Company No. 2 was, by the terms of the agreement of consolidation, to be held by the North American Company and the Mississippi Valley Trust Company as trustees for Union Company No. 2; in other words, as treasury stock. By this consolidation agreement the holders of Edison stock collectively received $1,500,-000 in stock of Union Company No. 2 and $75,000 in cash, and the holders of stock of Union Company No. 1 received $4,350,000 of the stock of Union Company No. 2.

The general basis of the consolidation of Union Company No. 1 and Edison Company was understood by the members of the Citizens' Syndicate and the North American Company prior to May 15, 1903. On June 19, 1903, the former directors of the Edison Company resigned and their places were filled by directors selected by the North American Company and the Citizens' Syndicate.

The master found, upon the question as to whether or not the defendants, in the consolidation between Union Company No. 1

and Edison Company, were actuated by fraudulent intent and purpose, as follows:

"The finding on this issue is controlled almost entirely by the finding as to the relative value of the two properties. If those values are as alleged in the bill, then, in view of the fact that the basis of the consolidation, though known as early as June, was suppressed until September 9, 1903, there would be sufficient ground for a finding of fraudulent intent. On the other hand, if the relative values coincide exactly or approximately with the basis of the consolidation, there is no room for such a finding."

The master found that the property of Union Company No. 1, aside from the Ashley plant, and the property of the Edison Company were equal in value, and this, we think, fully borne out by the testimony, as it appears that, for the year ending August 31, 1903, the earnings of the Edison Company were $794,842.91, the cost of operation $393,394.42, or 49½ per cent. of the gross earnings; that the income of Union Company No. 1 was $562,265.29, operating expenses $278,359, or 49½ per cent. of the gross receipts. These figures, the master found, represented the relative efficiency of the two properties. Union Company No. 1 and the Edison Company were, as we have seen, going concerns, and hence each had a potential value. The value of the Ashley street plant was practically all prospective. As a single unit it had no franchise, no good will, no customers. It had been contemplated to erect the Ashley street plant with a capacity of 12,000 kilowatts. Some work had been done upon the Ashley street plant, but the inability of Union Company No. 1 to negotiate its bonds, before giving the supplemental mortgage in June upon the Edison property, rendered it impossible for it to complete the construction of the plant until after the Edison property was pledged for that purpose. The plan for the Ashley street plant was changed and enlarged to one of 36,000 kilowatts.

The master, in his findings, we think, fell into an error in treating the Ashley street plant as having a large potential value, based upon the possibilities which would result upon its completion and operation, and giving all of this benefit to Union Company No. 1. He entirely ignores the fact that the construction of the Ashley street plant, with all its future possibilities, was only made possible by pledging the property of the Edison Company, and hence the Edison Company was entitled to an equal share of a large part of the value of the Ashley street plant. Had the same amount of money, derived from a mortgage of the properties of both the Union Company and the Edison Company, been applied to enlarging or constructing a new plant for the Edison Company, it is very evident that the parties would not have thought for a moment of crediting the entire value, actual and potential, of such structure, wholly to the Edison Company. To credit Union Company No. 1 with a value based upon the future possibilities of the Ashley street plant was both fallacious and inequitable.

The value of the tangible property of the Edison Company was fixed by an appraisement; that of Union Company No. 1 was simply assumed. The master found difficulty in making, from the evi-

dence, an accurate valuation of the properties. By a careful reading of the testimony, we appreciate the difficulty in that respect. But the defendants, upon acquiring the Edison property in the consolidation, opened books as of January 1, 1904, less than four months after the consolidation, and fixed the respective values of the properties. This valuation, made by the defendants upon their books, was a representation by them of the respective values of the property, and they cannot complain of its binding effect, in the absence of more definite and specific evidence of values. The values so stated by defendants were as follows: The tangible assets of the Edison Company, $2,905,142.97; the intangible assets, franchises, and good will, $3,005,168.20; or a total of $5,910,311.17. The tangible assets of Union Company No. 1, including the Ashley street plant, $3,436,442.04; the intangible assets, franchises, and good will $4,495,935.02. Of these intangible assets of Union Company No. 1, $2,075,000 was credited to the Ashley street plant, thus fixing the relative value of the two plants, with all the estimated assets, both tangible and intangible, of the Ashley street plant credited to Union Company No. 1, as 57 per cent. to Union Company No. 1 and 43 per cent. to the Edison Company. At the date of the consolidation the bonded indebtedness of the Missouri-Edison Company was $4,000,000, and that of Union Company No. 1 $4,000,000; the latter being the $4,000,000 bonds taken by the North American Company and the Citizens' Syndicate. The distribution, as actually made, was, as the master finds, substantially at the ratio of three to one. We cannot resist the conclusion that, in the distribution of the stock of Union Company No. 2 among the stockholders of Union Company No. 1 and the Edison Company, such distribution was so grossly unjust, and, considering the fact that the holders of the majority of the stock of the Edison Company were the sole stockholders of Union Company No. 1, that they fixed and determined the basis of distribution, and were the beneficiaries of the inequality, that their action in that regard was a breach of their trust and a fraud upon the minority stockholders of the Edison Company. These views require that the decree be reversed.

The decree is accordingly reversed, and the case is remanded to the court below, with instructions to ascertain the value of the property of Union Company No. 2 immediately after its consolidation, to assign 43 per cent. of that value to the Edison Company, to find the value of the stock of the appellants on that basis, and to enter a decree to rehabilitate the Edison Company, or that the appellants have a lien upon the property of Union Company No. 2 for the value of their stock and interest thereon from the date of the consolidation, and the costs of this suit, and that that lien be foreclosed, or for such other permissible relief in equity as to the court below shall seem meet and effective to satisfy the claim of the appellants, unless within a short day, named by the court, the defendants shall pay to the appellants the said value of their stock, and interest thereon from the date of the consolidation, and the costs of this suit.