The rules for preliminary injunction in these two cases were heard together. In disposing of the rules, I shall first take notice of the suit filed by the Journal Square Bank Building Company.
Bill of Journal Square Bank Building Company.
[1, 2] The complainant in this suit is a creditor of the defendant. As a general proposition, it is not permitted to a creditor of a corporation to prevent its merger or consolidation with another if the statutory law of its creation authorizes it. 7 Fletcher, Cyc. of Corp. p. 8329; Id. 8411; 8 Thompson on Corporations (3d Ed.) § 6037. A review of the cases cited in support of the text of these authors is not deemed necessary. Where there is no statutory provision specifically giving creditors of the constituent corporations a right of action against the consolidated concern, the creditors are not without remedy, for they may resort to equity to subject the assets of their debtor in the hands of the consolidated company to the satisfaction of their claims. This is the reason given by Thompson in the paragraph cited supra for the general rule that creditors will not be allowed to prevent a consolidation.
[3] If creditors are in no position to object to a proposed consolidation of their debtor with another corporation because resort to equity against the debtor's assets affords them protection, then a fortiori the express conference upon them by statute of a right of action generally by which not only the assets of their debtor but as well the entire assets of the consolidated company, whether derived from the debtor constituent or not, may be seized in satisfaction, would render less defensible the right of creditors to prevent a consolidation.
 The statute of Delaware, under which the *Page 186 
corporations here involved were created, expressly provides that in case of merger or consolidation the rights of creditors of the constituent corporations shall be preserved unimpaired, and all debts, etc., of the constituent companies shall thenceforth, after the merger or consolidation, attach to the consolidated corporation and be enforceable against it to the same extent as if said debts, etc., had been incurred or contracted by it. Section 60, General Corporation Law (35 Del. Laws, c. 85, § 19).
[4] The creditor in this cause, therefore, if the consolidation goes through, is made by law a general creditor of the consolidated company. The fact is that there will be a larger collection of net assets in the hands of the consolidated company to which the complainant may look for satisfaction of its debt than it can now look to in the hands of the constituent debtor. The fact that the quick asset condition of the consolidated company will, in relation to its liabilities, render it less desirable as a debtor from the viewpoint of current financial soundness than the constituent debtor, if true as alleged, cannot serve to justify an enjoining of the consolidation on the creditor's complaint. The complainant as creditor, as now appears, will have all the security it now has and considerably more besides. It is difficult then to see how the consolidation can possibly injure it.
But the Journal Square Bank Building Company objects further that it now has the right and so long as its claim lives will continue to have the right, by reason of its debtor's having qualified by license to do business in New Jersey, to sue it in that State, a condition on which its license to do business in that State was granted being that, even though it should withdraw from the State, process might still be served upon it through the Secretary of State of New Jersey; and that this remedy of suit in New Jersey will be lost to the complainant if the merger goes through, because in that event the life of the defendant will be terminated (section 60, Delaware General Corporation Law), and hence the complainant could no longer sue it in New Jersey. Thus, argues the complainant, a "remedy" belonging to it as a creditor will be taken from it, in violation of section 63 of the Delaware act (Rev. Code 1915, § 1977) which provides that the "rights or remedies" of creditors of a Delaware corporation "shall not in any way be lessened or impaired * * * by the consolidation of two or more corporations. * * *" Therefore, the complainant contends, the proposed consolidation should be enjoined for the complainant's protection, to the end that the "remedy" which the complainant now has to sue the defendant in New Jersey may not be lessened or impaired and the benefits of section 63 thereby denied to it.
Before specifically answering this point, I pause to observe that section 63 in terms applies only to the "consolidation" of corporations. This cause technically presents not a consolidation but a merger. But I hang nothing on that suggestion, for I apprehend that the term "consolidation" as used in the section is used in that loose sense which popular usage ascribes to it, as embracing technical mergers as well as consolidations, just as in this opinion the two words, if they have not already been, doubtless will be used as though they were synonymous. Without deciding the question, I nevertheless say that so the word seems to me to have been used in the section, notwithstanding in other parts of the act the words "consolidation" and "merger" appear to have been used by the Legislature in a way that reveals an appreciation of their technical distinction.
Assuming section 63 to apply then to mergers as well as to consolidations, what is the answer to the complainant's contention that it has a right to stay a merger in order to preserve to the complainant its right to a remedy by suit in New Jersey?
[5] In the first place I very much doubt that the act of merging would deprive the complainant of its right to a remedy in New Jersey. Section 60 of the Delaware act provides that "all debts, liabilities and duties of the respective constituent corporations shall thenceforth [after merger or consolidation] attach to said consolidated corporation, and may be enforced against it to the same extent as if said debts, liabilities and duties had been incurred or contracted by it." This language is broad enough to raise a strong argument in favor of the view that the continuing liability of the constituent debtor to be sued in New Jersey by reason of past transactions in that State becomes the liability of the company, into which it becomes merged or with which it is consolidated. If so, the complainant is deprived of no remedy, except possibly the right to sue the National Cash Credit Association in New Jersey eo nomine. That right, however, is purely technical. It has not sufficient of substance to move a court of equity.
[6] But, if the consolidated company could not be sued in New Jersey as an alter ego of the defendant, I still think the complainant has no ground of complaint. The "remedy" of suit somewhere will not be taken from it by the merger. It is expressly reserved to it by statute. I conceive that the word "remedies" as used in the statute refers to those recognized forms of redress which law and equity afford for the securing *Page 187 
of rights, without regard to the situs of the jurisdictions, in which they may be asserted. The statute makes lawful and authorizes the merger here under contemplation. If as a result of the statute's operation, a preserved remedy could no longer be asserted in a particular foreign jurisdiction, it would be a strange result if by reason of that fact the statutory authority would be nullified. The right to sue the defendant in New Jersey after it has withdrawn therefrom is a right which the New Jersey law attaches to the granting of a license to do business in that State. If that New Jersey right is in a substantial sense lost by reason of Delaware legislation, a question which as before indicated is doubtful, I think nevertheless that so far as the Delaware law is concerned the remedy in New Jersey is gone. When our statute preserves remedies genrally to creditors in consolidation and merger cases, it does not undertake to guarantee to them jurisdictions in which to assert the remedies.
 Bill of Cole, et al.
I now take up the case of the preferred stockholders who seek to enjoin the merger. The crucial point on which their complaint turns is one of value — whether or not they as stockholders in one of the constituents are to receive in exchange for their present holdings, stock which has a value commensurate with the asset contribution which their company is making to the common pool.
This is a question in the last analysis of what are the fair values to be ascribed to the assets of the defendant company in the merger plan.
The statute under which the contemplated merger is proposed to be put through does not compel an objecting minority of stockholders to submit to the compulsion of the majority to the extent of being forced into the status of stockholders in the consolidated enterprise. The option is given to each dissenting stockholder to elect whether he will take his allotment of stock in the consolidated company. If he prefers to dissociate himself from the consolidation, he may, by following the procedure laid down in section 61 of the General Corporation Law (35 Del. Laws, c. 85, § 20), secure a valuation of his stock in money and collect the same as a debt due.
[7, 8] As a general proposition dissenting stockholders are thus put to an election by the statute. There may be circumstances, however, under which a court of equity will say that the duty to make the election does not arise. For instance where the merger is not authorized by law, a dissenting stockholder is under no duty to make his election. He may enjoin its consummation. Jones v. Rhea, 130 Va. 345,107 S. E. 814; General Investment Co. v. Lake Shore, etc., R. Co. (C.C.A.) 250 F. 160. Furthermore, if consent to the merger be induced by fraud practiced upon a consenting company, a stockholder is under no duty to elect whether he will abide by a merger so induced or take his money. In such a case equity holds that no just alternatives are presented to him for a choice. See Bailey v. Citizens' Gas Light Co., 27 N. J. Eq. 196; Wilson v. Trenton Pass. Ry. Co., 56 N. J. Eq. 783, 40 A. 597. Where also the merger proposes illegally to wipe out a right to accumulated dividends on preferred stock, a court of equity will enjoin it on the application of a preferred stockholder. In such a case the stockholder's election is invited between two alternatives one of which is highly unfair. See Colgate v. U. S. Leather Co., 73 N. J. Eq. 72, 67 A. 657, reversed on other grounds, 75 N. J. Eq. 229, 72 A. 126, 19 Ann. Cas. 1262. From these and other cases which may be cited it thus appears that the election which is given to the stockholder is one that he is not, under any and all circumstances, required to exercise. The exercise of the statutory right of merger is always subject to nullification for fraud. The cases so hold.
[9] In the instant case fraud on the complainants is the ground on which their claimed right to an injunction is based. The fraud charged however is not actual fraud on the part of the directors and majority stockholders. It is constructive fraud based on an alleged discriminatory undervaluation of assets of the National Cash Credit Association on the one hand and an overvaluation of the assets of Franklin Plan Corporation, the consolidated company, on the other. When the fraud charged is of this nature, it must be so plainly made out as to disclose a breach of trust or such maladministration as works a manifest wrong to the dissentients. Raff v. Darrow, 184 Ind. 353, 111 N.E. 189. The overvaluation or undervaluation as the case may be must be such as to show a conscious abuse of discretion before fraud in law can be made out. Such is the tenor of the opinion of the Vice-Chancellor in Donald v. American Smelting Refining Co., 61 N. J. Eq. 458, 48 A. 786,788, reversed on other grounds, 62 N. J. Eq. 729, 48 A. 771, 1116. In Jones v. Missouri-Edison Electric Co. (C.C.A.) 199 F. 64, relief was granted because it was shown that the distribution of the stock of the merged company among the stockholders of the merging companies was "grossly unjust." This circumstance, combined with the fact that the dominating interests in the merger were the beneficiaries of the inequality, moved the court to grant the relief prayed for by the protesting minority.
 In the case sub judice, if there is an in *Page 188 
equality as between the merging companies, it is not coupled with any showing, or even intimation, that those who have engineered the merger or whose voting influence is great enough to accomplish it, are themselves beneficiaries of the alleged inequality. The case therefore is one that rests on the sole fact of alleged undervaluation and overvaluation of the assets of two of the merging companies.
[10-12] Where that is the case the rule adopted by this court as applicable to the sale of corporate assets would seem by analogy to supply a sound basis for guidance. While a consolidation is quite distinct from a sale, yet, from the viewpoint of the constituent companies, a sale of assets is in substance involved. Here it is the sale feature of the merger and that alone with which we are concerned. Looking then at the transaction as one where the stockholders of the defendant are in substance selling its assets to another in exchange for securities issued by the latter, what is the rule by which the value derived in exchange for the assets is to be tested for the purpose of discovering whether or not fraud can be said to have been shown? This question is answered by the case of Allied Chemical Dye Corp. v. Steel Tube Co., 14 Del. Ch. 1, 120 A. 486. The rule there laid down was that mere inadequacy of price will not reveal fraud. The inadequacy must be so gross as to lead the court to conclude that it was due not to an honest error of judgment but rather to bad faith, or to a reckless indifference to the rights of others interested. There is a presumption that the judgment of the governing body of a corporation, whether at the time it consists of directors or majority stockholders, is formed in good faith and inspired by a bona fides of purpose. Robinson v. Pittsburgh Oil Refining Corp., 14 Del. Ch. 193, 126 A. 46; Davis v. Louisville Gas Electric Co., 16 Del. Ch.___, 142 A. 654. As was said in the case of Donald v. American Smelting Refining Co., supra,
"It must be remembered, however, that a wide discretion in the matter of valuation, as in other matters, is confided to directors. As long as `they act in good faith, with honest motives, for honest ends,' the exercise of their discretion will not be interfered with. `Courts of equity,' says Mr. Thompson in his Works on Corporations, § 4518, `cannot be called upon to control the discretion of the managing bodies of corporations; otherwise, they would be choked with applications of recalcitrant stockholders. The action of a board of directors may be ill-advised or apparently unprofitable, but this furnishes no ground for invoking the restraining powers of the court.'"
The same presumption of fairness that supports the discretionary judgment of the managing directors must also be accorded to the majority of stockholders whenever they are called upon to speak for the corporation in matters assigned to them for decision, as is the case at one stage of the proceedings leading up to a sale of assets or a merger. No rational ground of distinction can be drawn in this respect between the directors on the one hand and the majority stockholders on the other. None was recognized in the Steel Tube Case and the Pittsburgh Oil Refining Case hereinabove referred to.
[13] I come now to the question of fact — viz: was there an undervaluation of the defendant's assets, and if so, was it so gross as to indicate bad faith towards the opposing minority? It is significant, that if there was such a grossly unfair discrimination against the class of stockholders among whom the complainants are numbered, only 40,0000 shares out of the total of 327,324 are protesting. Apparently about eighty-eight per cent. of the preferred stock outstanding is satisfied with the terms proposed. I do not mean to speak slightingly of forty thousand shares as a negligible number. The figures are giver merely to point out that in the judgment of an overwhelming majority of the stock in the interest of which this suit was filed, there is nothing in the situation which warrants a protest.
There are two items of fact which were dwelt upon at the argument and treated as of great moment. I am unable to attach any importance to them. One is the fact that the projected pro forma balance sheet of the consolidated enterprise contains an asset item of $500,000 for good will. Inasmuch as this item is set up as of the future, after the proposed merger is completed, it is manifest that no allocations of stock to the merging companies were based on it, none of the merging companies showing any corresponding valuation whatever of good will either in whole or in part. The most that can be argued from the presence of this item on the projected balance sheet is that perhaps the stock to be outstanding lacks $500,000 of having as much real assets under it as would appear. But that fact, if it be true, has no bearing on the relative participations of the merging companies in the total assets thrown into the merger pool. It simply means that each company has, as to that one asset, a proportionate interest in something that is newly created, that came from none, and that may be worth more or less.
The other fact, which seems to me to be of no moment is that a common stock subscription in the sum of $773,500 (221,000 shares at $3.50 each) is listed on the projected pro forma balance sheet as an asset under the *Page 189 
heading of cash. It should not of course be called cash. But there is no deception about it, for the balance sheet plainly shows that it is a stock subscription. If it had been listed as "expected cash from stock subscription," it would have accurately shown what the pro forma balance sheet now in substance states. The presence of the item has some effect on the net worth as shown by the pro forma balance sheet of the consolidated company after the merger, because, while a contra item of capital stock liability appears on the pro forma balance sheet, yet the latter is carried at only one dollar per share. As a result of this the sheet is made to show a surplus. If the subscription should never be paid, the surplus would disappear. The defendant has produced affidavits for the purpose of showing the financial responsibility of the subscriber, and that the subscription is therefore properly to be listed as an asset. Whether it should be recognized as an asset, it is not necessary for me to decide, for assuming that it should not be, as contended by the complainants, the basis of the allocations of stock to the merging companies which is the question we are here concerned with is in no way affected thereby. It is a yet-to-be created asset expected to arise in the future after the merger has been completed, and not credited to any of the constituents. It is as immaterial to the issues as is the goodwill item, and for the same reason as above stated in connection with that item.
There remain two other matters that were pressed by the complainants as evidence of the unfairness towards their company which they claim the merger works.
The first concerns the Community Finance Service Company. This company was a wholly owned subsidiary of the defendant. It was carried by the defendant on its books at cost, one hundred thousand dollars in round numbers. It was so carried on February 14, 1931, the date as of when the defendant's assets were valued for merger purposes. This asset was sold on March 10, 1931, to Franklin Plan Corporation, one of the merging companies, for six hundred thousand dollars, which was paid, one hundred thousand dollars in cash and note to the defendant for five hundred thousand dollars. Here then was an asset of the defendant demonstrated to be worth six hundred thousand dollars. But as of February 14, 1931, when the defendant's assets were valued for merger purposes, this item was given an asset value of only one hundred thousand dollars. It appears to me therefore that the defendant company in that one item alone would suffer a loss of credit allowance in its assets contribution to the merger of five hundred thousand dollars (about $1.52 per preferred share), and by the same token its preferred stockholders would have the underlying asset security of their stock diluted to the same extent if they accept the terms of exchange prescribed by the merger agreement. This showing however is not as large as it seems, for the Community Finance Service stock will be a part of the merged assets, and the preferred stockholders of the defendant who exchange their stock for stock of the consolidated company will, in proportion to their holdings in the latter, become part sharers in the asset security of the Community Finance Service stock. Their proportionate ownership of the total outstanding preferred stock to be issued will be about seventy-four per cent. Hence $1.12 of the $1.52 above mentioned will come back to them — a loss in underlying security value of only forty cents per share.
The other matter concerns the purchase indirectly by the Franklin Plan Corporation of ninety-two thousand shares of common stock of the defendant from one Badger, the former president of the defendant. This transaction was consummated April 8, 1921. The price agreed to be paid Badger was $1,-471,991.84, for which the Franklin Plan Corporation was and still is indebted. It is claimed by the complainants that the stock purchased from Badger was worth no more than $303,316.89. So the complainants' accountant estimates it. If this estimate be correct, it is apparent that the Franklin Plan Corporation, into which it is proposed that the defendant should merge, made an extravagant purchase. It is suggested that the control value of Badger's ninety-two thousand shares justified a high price. Perhaps so, if the companies were to continue as separate going concerns. I do not at the moment see, however, how that control value is properly appraisable in a merger proposal that contemplates the absorption of the company in which the control was bought. If this be true, the block of ninety-two thousand shares of common stock of the National Cash Credit Association held by the Franklin Plan Corporation (taking it as worth only $303,316.89 as contended) are not worth the amount the Franklin Plan Corporation agreed to pay for it by $1,168,674.95. Its liability, which however is fixed and of course continues after the merger, exceeds by that amount a contra asset.
This transaction is not reflected on the Franklin Plan Corporation's balance sheet as of March 31, 1931 — the balance sheet which was disclosed to the companies which were invited to merge into it. The complainants contend that if their company goes into the merger, it will, by reason of the improvident Badger transaction, be compelled to bear a share in a debt burden of $1,168,674.95 with no corresponding share in an asset to offset it.
 Whether the Badger block of stock should *Page 190 
be written down to $303,316.89, is a question of fact that is difficult on the present showing to pass upon. The affidavit of the accountant for the defendant admits that the value of the Badger block of stock "is considerably lower than $1,471,991.84." He does not say how much its value is. Neither does he say that the $303,316.89 figure of the complainants' accountant is too low. On the present showing I feel impelled to take the figure named by the complainants' accountant.
The result of the Community Finance Service Company and the Badger transactions is that each share of the preferred stock of the defendant, if it goes into the merger, will as before shown lose forty cents of asset security by reason of the former and, as I calculate its share of the debt burden which the Badger transaction imposes, will carry a load of $2.64. (I derive this figure by taking one-fifth of the quotient obtained from dividing the number of preferred shares after the merger into $1,168,674.95, the total of the debt burden.)
This shows a total disadvantage to the preferred stockholders of the defendant of $3.04 per share, which in comparison with the book value per share ($12.11 according to the complainants and $7.50 according to the defendant) is quite heavy.
[14] But when the matter is examined into further, the disadvantage thus shown is considerably if not entirely wiped out. It appears that the defendant carried on February 14, 1931, an asset item of total investments at $6,658,097.50. This item comprises by far the majority of its assets. These investments are in subsidiary or affiliated companies. There is no ascertainable market for them. The defendant contends that they are carried at inflated figures. The affidavit of Wood filed in the Journal Square Building Company suit (which though not technically filed in the stockholders' suit, I nevertheless feel. I should not disregard in this rule for preliminary injunction) shows that, according to the defendant's own records, the real worth of the investments is overstated on the balance sheet of February 14, 1931, by $1,469,277. If I correctly understand his affidavit he goes outside the defendant's books for his information upon value with respect to one item only — the Willard Securities Corporation, $500,-000 — which he counts as worthless. Eliminating that item, his affidavit would then disclose the defendant's overvaluation to be $969,277, which in terms of its preferred stock is $2.96 per share.
Thus the complainants' stock goes into the merger on a per share basis that is $2.96 per share in excess of liquidating value, and they complain that it is suffering by reason of two detached items out of a large total to the extent of $3.04 per share. The favor conferred about equals the burden imposed.
The affidavit of the accountant for the defendant shows that the net liquidating value of the defendant's assets as shown by its books is less than the value given for merger purposes by $1,400,000 as against the figure of $969,277 taken by me in the above calculation. If the amount of overvaluation be as much as $1,400,000, the complainants' stock will go into the merger with a per share overvaluation of over four dollars. This is the more significant as indicating no injustice to the complainants when it is pointed out with respect to the other merging companies, that their asset condition is less made up of investments in stock of affiliated companies and hence not so much subject to the likelihood of over valuation.
The complainants base some contention on the market value of their shares as being $11.13. The uncontradicted quotations from the New York Times shows the fact to be that on the New York Curb the market has been $4.00 low and $4.12 high. These quotations destroy the complainants' argument in so far as the market value is concerned.
The complainants speaking for themselves and others, vigorously complain because the stock which they bought has suffered a great market loss. That is unfortunate. It has however nothing to do with the merits or demerits of the proposed merger, which is to be judged in the light of values without reference to prices paid by investors.
After a rather painstaking study of the evidence before me, I fail to see anything in the proposed plan of merger which reveals any fraud, actual or constructive. The complainants therefore are not entitled to be relieved of exercising the election given to them by the statute of choosing whether they will accept stock under the merger or take the necessary steps to secure a valuation and payment in money.
 The rules in both cases will be discharged. *Page 199