ROBERT D. STERLING, RUTH L. STERLING, EDWARD STERLING, OLIVER STERLING, ELIZABETH PARKS STERLING, REALTY INVESTING COMPANY, CATHEDRAL ESTATES, INC., CHARLES KIMMELMAN, MILTON A. KIMMELMAN, ALLENHURST REALTIES, INC., RHINELANDER IMPROVEMENT CO., INC., HELEN KIMMELMAN, IDA KIMMELMAN, ALMA S. PORTER and RUTH S. FROST,

Plaintiffs below, Appellants,

vs.

MAYFLOWER HOTEL CORPORATION and HILTON HOTELS CORPORATION, Each a Corporation of the State of Delaware, Defendants below, Appellees.

*Supreme Court, On Appeal, November 18, 1952.*

SOUTHERLAND, C. J., and WOLCOTT and TUNNELL, JJ., sitting.

*S. Samuel Arsht*, of Morris, Steel, Nichols & Arsht, and *Stephen S. Bernstein*, of McLaughlin & Stern, of New York City, for plaintiffs below, appellants.

*William S. Potter*, of Berl, Potter & Anderson, and *Claude A. Roth*, of Chicago, for Hilton Hotels Corp., defendant below, appellee.

*Aaron Finger*, of Richards, Layton & Finger, and *William J. Friedman* and *Maurice Rosenfield*, of Chicago, for Mayflower Hotel Corp., defendant below, appellee.

SOUTHERLAND, Chief Justice, delivering opinion of the court:

The principal question presented is whether the terms of a proposed merger of Mayflower Hotel Corporation (herein "Mayflower") into its parent corporation, Hilton Hotels Corporation (herein "Hilton"), are fair to the minority stockholders of Mayflower.

The essential facts are these:

Mayflower and Hilton are both Delaware corporations. Mayflower's sole business is the ownership and operation of the Mayflower Hotel in Washington, D. C. It has outstanding 389,738 shares of common stock of $1 par value. Hilton and its subsidiary corporations are engaged in the business of owning, leasing, operating and managing hotel properties in many of the large centers of population in the country. Hilton has outstanding, in addition to an issue of convertible preference stock, 1,592,878 shares of common stock of $5 par value.

On December 18, 1946, Hilton acquired a majority of the outstanding shares of Mayflower. Thereafter it continued to make purchases of Mayflower stock. On or about February 4, 1952, it purchased 21,409 shares at a price of $19.10 a share, and on that date made an offer to all other minority stockholders to buy their shares at the same price. As of March 25, 1952, Hilton owned 321,883 shares, or nearly five-sixths of the outstanding stock.

From the time of the acquisition by Hilton of a majority interest in Mayflower, Hilton's management had contemplated a merger of Mayflower with Hilton. Soon after such acquisition, however, litigation ensued in the District of Columbia between Hilton and certain minority stockholders of Mayflower, not terminated until late in the year 1951. In the early part of 1950 the Mayflower directors discussed the question of ascertaining a fair basis of exchange of Mayflower stock for Hilton stock. All of the Mayflower directors (nine in number) were nominees of Hilton, and it was the view of the board (as well as of the Hilton board) that an independent study should be made by competent and disinterested financial analysts for the purpose of evolving a fair plan of exchange. Three of the members of the board (Messrs. Fleming, Folger and Baxter) had been directors before the acquisition by Hilton of its interest in Mayflower, and appear to have had little or no interest in Hilton. Messrs. Fleming and Folger were of opinion that although the study should be made no definite action should be taken upon the plan thereby to be developed until the Washington litigation should be finally terminated. The other directors deferred to this view.

In the early part of 1950 Standard Research Consultants, Inc., a subsidiary of Standard & Poor, was retained to make the study, and Mr. John G. Haslam, its vice president, undertook the work. Later he submitted a study which determined a fair basis of exchange of Hilton stock for Mayflower stock to be three-fourths of a share of Hilton for one share of Mayflower. No action was taken on the basis of this study.

The Washington litigation having been finally terminated, Mr. Haslam on January 7, 1952, was again retained to continue and bring up to date his prior study and to develop a fair plan of exchange. Thereafter he submitted his final study (hereinafter referred to as "the Haslam report"), which embodies his conclusion that a fair rate of exchange would be share for share. A plan for a merger upon this basis was approved by the boards of directors of both corporations. The directors—at least the Mayflower directors—appear to have relied largely on the Haslam report to justify their action. A formal agreement of merger was entered into on March 14, 1952, providing for the merger of Mayflower (the constituent corporation) into Hilton (the surviving corporation), as authorized by the provisions of *Section 59 of the General Corporation Law, Rev.Code of Del. 1935, par. 2091, as amended.* Each outstanding share of Mayflower is converted into one share of Hilton. A separate agreement between Hilton and Mayflower provides that for a limited period Hilton will pay $19.10 a share for any Mayflower stock tendered to it by any minority stockholder. At stockholders' meetings held in April the requisite approval of the merger was obtained. At the Mayflower meeting 329,106 shares were voted in favor; 4,645 against. Holders of 35,191 shares of Mayflower who objected to the merger did not vote. The Hilton stockholders voted overwhelmingly to approve the merger.

On April 7, 1952, plaintiffs below (herein "plaintiffs"), holders of 32,295 shares of Mayflower stock, filed their complaint in the court below, seeking injunctive relief against the consummation of the merger, on the ground that the terms of the merger are grossly unfair to the minority stockholders of Mayflower, and that the Mayflower directors entered into the merger agreement in bad faith.

The Chancellor, having issued a temporary restraining order against the consummation of the merger, heard the case on a motion for a preliminary injunction. A large number of affidavits were filed and voluminous depositions were taken. The Chancellor found no fraud or bad faith in the case and concluded that the plan was fair to the minority. He also determined that a quorum of Mayflower directors was present at the board meeting of March 6 when the merger was approved. See 89 *A.2d* 862. On June 18 he denied injunctive relief, and plaintiffs thereafter appealed.

Plaintiffs' principal contention here, as in the court below, is that the terms of the merger are unfair to Mayflower's minority stockholders. Plaintiffs invoke the settled rule of law that Hilton as majority stockholder of Mayflower and the Hilton directors as its nominees occupy, relation to the minority, a fiduciary position in dealing with Mayflower's property. Since they stand on both sides of the transaction, they bear the burden of establishing its entire fairness, and it must pass the test of careful scrutiny by the courts. *Keenan v. Eshleman*, 23 *Del.Ch.* 234, 2 *A.2d* 904, 120 *A.L.R.* 227; *Gottlieb v. Heyden Chemical Corp.*, *ante p.* 82, 90 *A.2d* 660. Defendants agree that their acts must meet this test. We therefore inquire whether the facts sustain the conversion ratio of share for share which forms the basis of the merger agreement.

As the Chancellor observed, the Haslam report forms the principal justification for the terms of the merger. We accordingly examine it.

The report is an elaborate study of some forty pages (including charts) with a long appendix containing analyses of pertinent financial data. The principles upon which it is based are set forth in the Chancellor's opinion. See *ante p.* 20, 89 *A.2d* 862, 867. Implicit in the report is the assumption that the legal principles governing the transaction require a comparison of the value of the stock of Hilton with stock of Mayflower. Since the report is the basis of the conversion terms of the merger agreement, it is in effect directed to a determination of the question whether, upon the conversion of Mayflower stock into Hilton stock, the Mayflower minority stock-

holder will receive the substantial equivalent in value of the shares he held before the merger. Thus a comparison is required of factors entering into the ascertainment of the values of both stocks. In Haslam's opinion the problem reduces to "a comparison of the operating trends of each of the corporations and of the investment characteristics of the two stock issues." A summary of some of the more important comparisons developed in the report is set forth in the margin.[1] On the basis of these comparisons, as well as upon consideration of the past history and future prospects of the two corporations, Haslam concludes that the financial record of Hilton has been substantially superior to that of Mayflower, and that purely upon a statistical basis it could be argued that Hilton should not offer better than three-fourths of a share of Hilton for one share of Mayflower. Nevertheless it is his opinion that, because of the problems incident to Hilton's control of Mayflower and the advantages incident to complete ownership, a share-for-share exchange will be fair and reasonable to all concerned.

An affidavit of J. Sellers Bancroft, vice president in charge of trust department investments of Wilmington Trust Company,

---

[1] Comparisons drawn from Haslam report:

AVERAGE EARNINGS PER SHARE

|  | HILTON | MAYFLOWER |
|---|---|---|
| 1947–1951 AVERAGE: | | |
| Before income taxes and extraordinary items | 4.31 | 2.17 |
| After income taxes and extraordinary items | 2.79 | 1.17 |
| 1951 TO NOV. 30: | | |
| Before income taxes and extraordinary items | 4.22 | 3.14 |
| After income taxes and extraordinary items | 2.37 | 1.15 |

DIVIDENDS PER SHARE

| | HILTON | MAYFLOWER |
|---|---|---|
| 1947–1951 Average | 1.07 | .34 |
| 1951 | 1.20 | .40 |

BOOK VALUE PER SHARE

| | | HILTON | MAYFLOWER |
|---|---|---|---|
| Nov. 30, 1951 | Per books | 18.26 | 14.38 |
| | Adjusted | 18.42 | 13.98 |

MARKET VALUE PER SHARE

| | HILTON | MAYFLOWER |
|---|---|---|
| 1950 Average | 12.88 | 11.25 |
| 1951 Average | 15.46 | 15.56 |
| Approximate current price [at date of study] | 14.75 | 16.25 |

sets forth his conclusion, reached after a review of Mr. Haslam's study and an examination of pertinent financial data, that a share-for-share exchange is unquestionably fair.

The Haslam report contains no finding of net asset value—a factor nevertheless proper to be considered. Plaintiffs submitted affidavits containing an appraisal of the Mayflower Hotel (including land) and an estimate of reproduction cost (less depreciation) of the hotel proper. These affidavits indicate a value of upwards of $10,000,000. If plaintiffs' figure of a minimum value of $10,500,-000[2] be accepted (it was accepted by the Chancellor), a share of Mayflower stock would have a liquidating or net asset value of about $27 a share. Defendants submitted an affidavit of J. B. Herndon, Jr., vice president and treasurer of Hilton, to the effect that two of the hotel properties of Hilton (the Conrad Hilton and the Palmer House in Chicago), which are carried on the books at $26,800,000, have a value of at least $60,000,000. Mr. Hilton gave some testimony to the same effect. If the indicated increase of $33,200,000 be accepted, there is added to Hilton's per share book value about $20, making an asset value of about $38 a share. Haslam submitted a comparison of "indicated values" of the hotel properties, arrived at by assuming rates of capitalization of earnings derived from plaintiffs' appraisal of the Mayflower Hotel and applying such rates to the Hilton earnings, and, by two different methods, arrived at figures of $30.56 and $40.82 as "indicated" net asset values of a share of Hilton stock. Plaintiffs submitted no evidence of value of the Hilton hotel properties.

Now, it will be noted that all of the comparisons above set forth except that of market value are in favor of Hilton. As for the market value of Mayflower stock, it appears to be conceded by all parties to be fictitious, that is, higher than would be justified in a free and normal market uninfluenced by Hilton's desire to acquire it and its policy of continued buying. At all events, that is the natural inference from the evidence. If we lay aside market value, and also disregard the comparison of book values—a factor, as the Chancellor said, of little relevancy in this case—we find three

---

[2] Arrived at by adding to the appraised value $500,000 in liquid assets.

comparisons of various degrees of importance—earnings, dividends and net asset value—all in favor of Hilton.

If, therefore, we should accept the findings in the Haslam report and the principles on which it is based, and also accept the evidence bearing on comparative net asset value of Mayflower and Hilton stock, we should have to conclude that a share of Hilton stock has a value at least equal to a share of Mayflower stock, and that no unfair treatment of the Mayflower minority stockholders has been shown.

But we are confronted at the outset with the contention of the plaintiffs, basic to their case, that the Haslam report and the comparisons of value therein developed are wholly irrelevant to the issues before us. This contention, urged with much vigor—and repetition—is that the transaction here assailed is in substance a sale of assets by a fiduciary to himself. That the transaction is cast in the form of a merger, they say, is of no consequence; it is in effect a sale, and the only relevant comparison to be made is the comparison of the value of the transferred assets—worth $10,500,000—with the value of the consideration—389,738 shares of Hilton stock of a market value of $5,846,700; a disparity so shocking as to stamp the transaction as a fraud upon the Mayflower minority stockholders.

If plaintiffs' contention should be accepted it would follow that upon every merger of a subsidiary into its parent corporation that involves a conversion of the subsidiary's shares into shares of the parent, the *market* value of the parent stock issued to the stockholders of the subsidiary must equal the *liquidating* value of the subsidiary's stock. On its face this proposition is unsound, since it attempts to equate two different standards of value. In the case of many industrial corporations, and also in the instant case, there is a substantial gap between the market value and the liquidating value of the stock; and to apply to the merger of such corporations the proposition advanced by plaintiffs would be to bestow upon the stockholder of the subsidiary something which he did not have before the merger and could not obtain—the liquidating value of his stock. See *Porges v. Vadsco Sales Corp.*, 27 *Del.Ch.* 127, 32 *A.2d* 148.

What is the reasoning by which plaintiffs would lead us to sanction such a result?

Plaintiffs start with a quotation from the opinion of Chancellor Wolcott in the case of *Cole v. National Cash Credit Ass'n*, 18 *Del.Ch.* 47, 57, 58, 156 *A.* 183, 188, which involved a merger of several Delaware corporations. Preferred stockholders of National (one of the constituent corporations) charged that if the merger were effected the asset security underlying the preferred stock of the surviving corporation that was to be given in exchange for their preferred stock in National would be less in value than that which underlay their National stock; and that this reduction in value flowed from an undervaluation of National's assets in comparison with the assets of the other merging corporations. Plaintiffs' charge of unfairness was thus based upon alleged disparity in comparative net asset values. The Chancellor said:

"The case therefore is one that rests on the sole fact of alleged undervaluation and overvaluation of the assets of two of the merging companies."

Announcing a rule embodying a test of fraud applicable to such a case, the Chancellor continued:

"Where that is the case the rule adopted by this court as applicable to the sale of corporate assets would seem by analogy to supply a sound basis for guidance. While a consolidation is quite distinct from a sale, yet, *from the viewpoint of the constituent companies, a sale of assets is in substance involved.* Here it is the sale feature of the merger and that alone with which we are concerned. *Looking then at the transaction as one where the stockholders of the defendant are in substance selling its assets to another in exchange for securities issued by the latter,* what is the rule by which the value derived in exchange for the assets is to be tested for the purpose of discovering whether or not fraud can be said to have been shown? This question is answered by the case of *Allied Chemical & Dye Corp. v. Steel & Tube Co.,* 14 *Del.Ch.* 1, 120 *A.* 486." 18 *Del.Ch.* 57–58, 156 *A.* 188; emphasis plaintiffs'.

Seizing upon the emphasized language and disregarding the facts to which it was directed, plaintiffs say in effect: A merger is essentially a sale of assets; this transaction is a sale of assets by a fiduciary (Hilton) to itself for shares of stock worth shockingly less than the assets sold; therefore the transaction is a fraud. So runs the syllogism.

██ A manifest fallacy, we think, lurks in the basic premise of this reasoning. A merger may be said to "involve" a sale of assets,

in the sense that the title to the assets is by operation of law transferred from the constituent corporation to the surviving corporation; but it is not the same thing. It is, as the introductory clause of Chancellor Wolcott's language affirms, something quite distinct, and the distinction is not merely one of form, as the plaintiffs say, but one of substance. A merger ordinarily contemplates the continuance of the enterprise and of the stockholder's investment therein, though in altered form; a sale of all assets (the type of sale referred to in the *Cole* case) ordinarily contemplates the liquidation of the enterprise. In the first case the stockholder of the merged corporation is entitled to receive directly securities substantially equal in value to those he held before the merger; in the latter case he receives nothing directly, but his corporation is entitled to receive the value of the assets sold. The scope of the applicable sections to our *General Corporation Law* (*Section* 59, relating to mergers and consolidations, and *Section* 65, relating to sales of all the corporate assets) may to some extent overlap; but this is not to say that the two procedures differ only in form. They are, in general, distinct and designed for different ends.

The instant case supplies an apt illustration. The Mayflower assets are not to be liquidated; the property is not for sale. Its directors and stockholders have determined, not that the venture should be terminated, but that it should be integrated completely with the Hilton enterprise. Having made this decision they had the right to avail themselves of the means which the law provides for just such a purpose, subject always to their imperative duty to accord to the minority fair and equitable terms of conversion.

Nor do we think that the *Cole* case supports plaintiffs' contention. The quoted language embodies, as Chancellor Wolcott indicated, an analogy and not a definition. The question actually before him was one of comparative net asset values. Thus, at the beginning of that portion of the opinion which deals with the objections of the preferred stockholders, he said:

"The crucial point on which their complaint turns is one of value-whether or not they as stockholders in one of the constituents are to receive in exchange for their present holdings, *stock which has a value commensurate* with the *asset contribution which their company* is making to the common pool." 18 *Del.Ch.* 55, 156 *A.* 187; emphasis plaintiffs'.

Plaintiffs interpret the words "commensurate with" as meaning "equal to". Thus they say that the quoted language makes it plain that a comparison of the value of the assets transferred with the value (i. e., market value) of the stock issued in exchange is the only relevant factor to be considered.

But this is not what the language says nor what it means. The reference is to the value of the assets underlying the stock extinguished by the merger compared with the value of the assets which will underlie the stock to be received upon the consummation of the merger. Thus, in a later part of the opinion the Chancellor speaks of the question before him as one involving "the relative participations of the merging companies in the total assets thrown into the merger pool", 18 *Del.Ch.* 59, 156 *A.* 188, and ultimately resolves the question by comparing the net asset value of a share of the stock extinguished with a similar valuation of the stock to be received. There is no suggestion in the case that in determining the fairness of a merger net asset value of one stock should be compared with market value of the other.

The unsoundness of such a method of comparison is illustrated by the subsequent decision in *Mitchell v. Highland-Western Glass Co.*, 19 *Del.Ch.* 326, 167 *A.* 831. In that case all the assets of Highland were to be sold to Mississippi Glass Company for shares of stock of the seller. The consideration was alleged to be grossly inadequate. Plaintiffs' counsel argued that the number of shares issued in payment for the sale was based on a ratio of assets of two to one; whereas the assets were nearly equal in value, and the ratio was grossly unfair. To develop this argument he took the full book value of the seller's assets as their fair value, but refused to value the stock received by the same method. The Chancellor dismissed the argument with the terse comment: "Manifestly that is unjustifiable." 19 *Del.Ch.* 333, 167 *A.* 834.

Plaintiffs' attempt to push to extremes the analogy drawn from a sale of assets leads them to a wholly untenable position, viz., that upon a merger a stockholder of a subsidiary is entitled to receive securities equal in value to the liquidating value of his stock. As we have already indicated, this proposition is unsound. Speaking generally, a merger effects an exchange of shares of stock

in a going concern for shares in another going concern. In determining the fairness of the exchange liquidating value is not the sole test of the value of either. In the *Porges* case, *supra*, preferred stockholders objected to a merger which accorded recognition to the common stock on the ground that the common shares were without value—that is, without liquidating value. Implicit in this objection was the assumption that liquidating value was the sole test by which the measure of recognition accorded to the common stock in the merger was to be evaluated. Vice-Chancellor Pearson rejected the argument, pointing out that the preferred stockholders had no right to require liquidation of the corporation and that the rights of the two classes of stock must be viewed in the light of the fact that the corporation was a going concern. He announced the following rule:

"To arrive at a judgment of the fairness of the merger, all of its terms must be considered." 27 *Del.Ch.* 134, 32 *A.2d* 151.

A similar rule obtains in ascertaining the value of stock in appraisal proceedings under the merger statute. In such cases the liquidating value of the stock is not the sole test of value; all relevant factors must be considered. *Tri-Continental Corp. v. Battye*, 31 *Del.Ch.* 523, 74 *A.2d* 71; *Chicago Corp. v. Munds*, 20 *Del.Ch.* 142, 172 *A.* 452; and *Root v. York Corp.*, 29 *Del.Ch.* 32,50 *A.2d* 52.

The cases cited to us by plaintiffs from other jurisdictions do not, we think, afford any support to their contention. Thus, in *Wheeler v. Abilene National Bank Building Co.*, (8 *Cir.*) 159 *F.* 391, liquidation of the corporate property and distribution of the consideration to the stockholders had been determined upon by the management. The president and majority stockholder procured a sale to himself for an amount less than could have been obtained from another prospective purchaser. We agree with the conclusion reached in that case but it is of no help to plaintiffs here.

*Jones v. Missouri-Edison Electric Co.*, (8 *Cir.*) 144 *F.* 765, involved a merger which was adjudged grossly unfair to the minority stockholders of the constituent corporation because they were to be given shares of stock of an asset value far below the asset value which underlay their stock prior to the merger. The fraud there charged is similar to that charged in the *Cole* case,

that is, a gross disparity in asset value, compelling the conclusion that the merger was unfair to the minority. This case is likewise inapposite.

In *Outwater v. Public Service Corp.*, 103 *N.J.Eq.* 461, 143 *A.* 729, Vice Chancellor Backes held a merger unfair to the minority because their securities in the constituent corporation were converted into preferred stock redeemable within three years at the option of the surviving corporation. The court held that the contingency of the elimination of the stockholder's right of permanent participation in the merged company was unfair and the right to exercise the option to redeem was oppressive and in-equitable. Not only is the case of no assistance to plaintiffs, but implicit in it is approval of the test of fairness which we think the correct one, viz., that upon a merger the minority stockholder shall receive the substantial equivalent in value of what he had before.

Plaintiffs stress some language in each of the opinions in the *Jones* and *Outwater* cases, similar to that in the Cole case, analogizing the transaction under review to a sale. As in the *Cole* case, this language must be read in the light of the facts to which it is directed.

In *May v. Midwest Refining Co.*, (1 *Cir.*) 121 *F.2d* 431, sale of a subsidiary's properties and liquidation of a corporation was determined upon by the majority stockholder. A charge in the complaint that the sale to the controlling stockholder was in breach of its fiduciary duties because it made no attempt to sell to anyone except itself was held to be a sufficient allegation to support a finding of unfair treatment. No question of merger was involved.

In *Lebold v. Inland Steel Co.*, (7 *Cir.*) 125 *F.2d* 369, a dissolution of a subsidiary and a purchase of all of its assets by the parent corporation was held to have been determined upon in bad faith. In the case at bar there is no evidence that any of the Mayflower's directors acted in bad faith or from corrupt motives in determining that a merger should take place. This case is likewise not in point.

No case is cited to us holding that upon a merger of a subsidiary into a parent corporation the minority stockholders of a subsidiary are entitled to the liquidating value of their stock.

In the instant case the Chancellor held that in a case of merger "all relevant value factors must be considered in arriving at a fair value for comparison purposes." *Ante p.* 28, 89 *A.2d* 862, 866.

For the reasons above given, we find no error in this ruling.

The main question of law having been resolved against the plaintiffs, we turn to their remaining contentions. *Criticisms of the Haslam report.*

Plaintiffs make some criticisms of the Haslam report designed to rebut or weaken its findings.

First, they say that the Haslam report is unacceptable because it was designed as a plan for a voluntary exchange and not in contemplation of a merger; the word "merger", say the plaintiffs, does not occur in it. Hence (plaintiffs apparently argue) it has no bearing on the fairness of a merger plan.

We think the argument wholly unsubstantial. It reduces to a criticism of the use of the word "exchange" instead of the word "conversion"—the term technically correct in describing the effect of a merger. Obviously comparisons used to determine, abstractly, the fairness of a voluntary exchange of one share of stock for another are equally pertinent in determining the fairness of a compulsory exchange, that is, a conversion of one share of stock into another. Moreover, it is scarcely to be supposed that the Haslam report was obtained for the purpose of inducing minority stockholders to make a voluntary exchange. From the beginning of Hilton's control a merger had been looked forward to.

Next, plaintiffs assert that the Haslam report contains certain errors in the figures developed. They say that the Haslam report uses the figure of $14.38 as the book value of Mayflower stock, whereas the testimony shows the correct figure to be $17.50; that the Haslam report uses the figure of $16.25 a share as the market price of Mayflower, whereas Hilton had paid $19.10 a share for the stock; and that the comparison of earnings of the two corporations appearing in the report is inaccurate in that a nonrecurring item of $70,000 of litigation expense was not eliminated from the computation and capital improvements amounting to about $41,000 had

been charged to maintenance and repairs on Mayflower's books. All these criticisms were advanced in the court below and were carefully considered by the Chancellor, who found them all without merit. The comparison of book values, as we have indicated, is of little relevancy here; the market value, as we have shown, is fictitiously high, and Hilton's purchases at $19.10 a share are, under the circumstances, no evidence of true market value. As for the other matters—if they represent anything more than a difference of accounting opinions—they are immaterial, since, if the soundness of the criticisms be conceded and the suggested corrections be made, the comparison of earnings would still be in favor of Hilton. We approve the Chancellor's findings on these matters.

An argument of more substance is directed to the question of the net asset value of a share of Hilton.

Noting the omission in the Haslam report of any comparison of such values, plaintiffs develop the contention that the defendants, having the burden to justify the terms of the merger, have failed to sustain it, since no proper appraisal of Hilton's physical assets has been made. As for the evidence submitted after the suit was filed, plaintiffs say that it is of little value and inadequate to supply the deficiency in the Haslam report. At the very least, they contend, defendants' failure to present formal appraisals of Hilton's assets calls for fuller investigation of the matter than was possible at a hearing on a motion for a preliminary injunction, and the status quo should be preserved until final hearing.

As we have already held, net asset value is one of the factors to be considered in determining the fairness of a plan of merger. But the requirement that consideration be given to all relevant factors entering into the determination of value does not mean that any one factor is in every case important or that it must be given a definite weight in the evaluation. *Cf. Tri-Continental Corp. v. Battye, supra.* The relative importance of several tests of value depends on the circumstances. Thus, in some cases net asset value may be quite important. See *Cole v. National Cash Credit Ass'n, supra;* and *Jones v. Missouri-Edison Electric Co., supra.* But in the case at bar it is of much less importance than the factors analysed in the Haslam report. We are dealing here

with corporations engaged in the hotel business, whose capital is invested largely in fixed assets. The shares of such corporations are worth, from the viewpoint of an investor, what they can earn and pay. A comparison of net asset values may have some weight, but it is of much less importance than demonstrated capacity of the corporation to earn money and pay dividends. In *Allied Chemical & Dye Corp. v. Steel and Tube Co. of America,* 14 *Del.Ch.* 64, 122 *A.* 142, Chancellor Wolcott, dealing with the relative importance of replacement costs and earning power as standards of value in connection with industrial property, expressed the view that earning power is by far the more important. 14 *Del. Ch.* 73, 122 *A.* 142. And compare 1 *Bonbright, Valuation of Property, Ch. XII, pp.* 240–244, "Bearing of Asset Valuations on an Enterprise Appraisal". In respect of earning power the superiority of Hilton stock is clearly shown. In these circumstances we deem the evidence adduced by defendants upon the issue of comparative net asset value to be sufficient to discharge whatever duty they were under in respect of the matter; and this notwithstanding the inconclusive nature of the "indicated values" arrived at by Haslam.

Plaintiffs say that the directors of Mayflower did not give proper consideration to the question of the value of Mayflower's assets in their approval of the terms of the merger. As we have shown, the only pertinency of this figure is to develop a comparison of net asset value per share between Mayflower stock and Hilton stock. Since the deficiency of the Haslam report in this respect is supplied by other evidence the effect of which is to corroborate the findings of the Haslam report, we think this omission (if it was an omission) of little significance.

■ Nor are we impressed with plaintiffs' claim that they were afforded in the court below insufficient time to controvert defendants' evidence in respect of the value of Hilton's assets. If the issue was then deemed important and the time available was believed to be inadequate for procuring and filing controverting affidavits, plaintiffs could have applied to the court for indulgence in this regard. But, apart from this consideration, it is difficult for us, in the light of plaintiffs' main contention, so earnestly pressed, to

believe that a comparison of net asset value was deemed by them to be an issue of any consequence. They chose to pitch their case upon a theory of law—already examined and found to be erroneous —that dispensed with any consideration of comparative net asset values, as well as of values derived from comparisons of earnings and dividends. The record indicates that further investigation of comparative net asset values would yield no evidence favorable to Mayflower—much less evidence sufficiently weighty to over-throw the findings of the Haslam report.

We think that the foregoing contentions are without merit.

*Hilton's offer to buy Mayflower stock at $19.10 a share.*

The facts with respect to this offer are set forth above. The price derives from a purchase by Hilton in February, 1952, of 21,409 shares of Mayflower stock at $19.10 a share from a group headed by John E. Meyers, one of the interveners in the Washington litigation. A similar offer is now made to the remaining minority stockholders in connection with but not technically as a part of the plan of merger.

Upon these facts plaintiffs build an argument that the price thus voluntarily paid by Hilton, and still offered for Mayflower shares, shows the unfairness of converting one share of Mayflower into one share of Hilton. This argument assumes that the price in Hilton's offer is better evidence of value than the prices of the over-the-counter market and the values indicated by the Haslam report. This does not follow; on the contrary, the true inference would seem to be that, for whatever reason, Hilton paid for a large block of shares somewhat higher than real value. Messrs. Baxter and Fleming, two of the directors who had served under the prior management, are of the opinion that Mayflower stock is not worth $19.10 a share. After the Meyers purchase, Hilton may have determined to continue the offer to others in order to avoid any charge of having accorded the Meyers group special treatment. But Hilton's reasons for doing so are not here important; it is enough to say, as the Chancellor said, that the minority stockholders of Mayflower suffer no harm from the offer and have no ground of complaint.

*Conclusion.*

■ We have considered all of plaintiffs' objections to the fairness of the proposed merger, and find ourselves in accord with the Chancellor's conclusion that no fraud or unfairness has been shown.

*The question of a quorum.*

There remains for consideration the contention that no quorum was present at the meeting of the board of directors of Mayflower on March 6, 1952, at which the merger was approved.

Six of the nine directors were present—Messrs. Baxter, Folger, Fleming, Herndon, Hilton and Mack. Under the by-laws a quorum consists of five directors. Plaintiffs appear to concede that Messrs. Baxter and Folger were qualified to act, but say that the others are, by reason of some interest in or connection with Hilton, disqualified for quorum purposes. Defendants' answer (among others) is that Mayflower's certificate of incorporation permits the counting of interested directors for quorum purposes; and plaintiffs reply that the provision to that effect is invalid.

An excerpt from Article Thirteenth of Mayflower's certificate of incorporation is set forth in the margin.[3] In substance, so far as here pertinent, it provides that, fraud being absent, a transaction with another corporation is not invalidated by reason of the existence of interlocking directors or directors otherwise interested in such other corporation; and further provides that any such

---

[3] *"Thirteenth*: In the absence of fraud, no contract or other transaction between this Corporation and any other corporation or any partnership or association shall be affected or invalidated by the fact that any director or officer of this corporation is pecuniarily or otherwise interested in or is a director, member or officer of such other corporation or of such firm, association or partnership or is a party to or is pecuniarily or otherwise interested in such contract or other transaction or in any way connected with any person or persons, firm, association, partnership or corporation pecuniarily or otherwise interested therein: any director may be counted in determining the existence of a quorum at any meeting of the Board of Directors of this Corporation for the purpose of authorizing any such contract transaction with like force and effect as if he were not so interested, or were not a director, member or officer of such other corporation, firm, association or partnership; * * *."

director may be counted toward a quorum. It is this latter provision which is assailed as invalid.

*Paragraph 8 of Section 5 of the General Corporation Law, Rev.Code of Del., 1935, Par. 2037, sub-par. 8, provides:*

"8. The Certificate of Incorporation may also contain any provision which the incorporators may choose to insert for the management of the business and for the conduct of the affairs of the corporation, and any provisions creating, defining, limiting and regulating the powers of the corporation, the directors and the stockholders, or any class of the stockholders, or, in the case of a corporation which is to have no capital stock, of the members of such corporation; provided, such provisions are not contrary to the laws of this State."

■ Plaintiffs say that the word "laws" in the concluding proviso of this paragraph means the common law as well as statute law; and that the provision in Mayflower's charter permitting an interested director to be counted toward a quorum is contrary to the common law of this state as announced in *Blish v. Thompson Automatic Arms Corp.*, 30 *Del.Ch.* 538, 64 *A.2d* 581. If plaintiffs are right, this proviso, originally enacted in the *General Corporation Law of* 1899, *Vol.* 21, *Laws of Del., Chap.* 273, has the effect of forbidding the stockholders of a Delaware corporation to modify by agreement the effect of any rule of the common law relating to the regulation of the corporate enterprise. Such a construction unwarrantably narrows the scope of the enabling portion of the paragraph. That portion confers, in the most general language, the right to include in a certificate of incorporation any provision deemed appropriate for the conduct of the corporate affairs. The rapid development of corporation law in this country—certainly in this state—furnishes repeated examples of departure from common law principles, and negatives the suggestion that the legislature intended by this provision to codify (in effect) all the common law rules applicable to the governance of corporate affairs. In *Butler v. New Keystone Copper Co.*, 10 *Del.Ch.* 371, 93 *A.* 380, a charter provision authorizing sale of all the corporate assets with the consent of three-fourths in interest of the stockholders was upheld against the objection here made, viz., that such a provision was not expressly authorized by statute and was contrary to the common law. We are unwilling to assent to plaintiffs' contention that all the rules of the common law applicable to

corporations are brought within the sweep of the phrase "laws of this State."

Plaintiffs cite the case of *State ex rel. Cochran v. Penn-Beaver Oil Co.*, 4 *W.W.Harr.* (34 *Del.*) 81, 143 *A.* 257, in which the Superior Court en Banc held invalid a charter provision amounting in effect to a denial of any right of inspection of corporate books by a stock-holder. The reasoning of the court appears to emphasize the intro-ductory language of paragraph 8 rather than the language of the proviso and draws a distinction between regulation and prohibition of the common law rights of stockholders. There is also language suggesting that a right given by the common law may not be abrogated. We need not review the soundness of this reasoning except to say that if the opinion is read as announcing the broad rule contended for by plaintiffs we cannot agree with it. The case is, of course, clearly distinguishable upon its facts.

On the other hand, it is clear that the scope of the proviso is broader than the field of statutory law. In *Greene v. E. H. Rollins & Sons, Inc.*, 22 *Del.Ch.* 394, 2 *A.2d* 249, 252, a charter provision was found to contain unreasonable restraints on alienation of shares of stock and was held invalid. Answering the argument that a corporate charter is a contract binding on the stockholders, Chancellor Wolcott said:

"No individual may exercise his broad power to enter into contract relations with another so as to offend against what the law deems to be sound public policy."

■ The language of *Section 5, Paragraph 8*, was not dis-cussed; but the case may be said to hold that the broad powers conferred by *Paragraph 8 of Section 5 of the General Corporation Law* do not authorize the stockholders to contract with each other or with the corporation to achieve a result forbidden by settled rules of public policy. Such a provision would be "contrary to the laws of this State."

■ ■ A precise delimitation of the scope of the proviso is difficult to formulate; the limits of "public policy" are ill-defined and changing. We do not attempt a definition; but we say that the stockholders of a Delaware corporation may by contract embody in the charter a provision departing from the rules of the common

law, provided that it does not transgress a statutory enactment or a public policy settled by the common law or implicit in the *General Corporation Law* itself.

Turning to the charter provision before us, we find it to be one relating to the powers of the directors in conducting the corporate business. It permits interested directors to be counted toward a quorum. There is no Delaware decision dealing directly with the validity of such a provision, although in *Martin Foundation v. North American Rayon Corp.*, 31 *Del.Ch.* 195, 68 *A.2d* 313, the Chancellor upheld the validity of a charter provision that broadened the definition of disqualifying interest of directors for quorum purposes. In *Piccard v. Sperry Corp.*, (*D.C.N.Y.*1943), 48 *F.Supp.* 465, affirmed (2 *Cir.*), 152 *F.2d* 462, Judge Rifkind was of opinion that the law of Delaware did not forbid such a provision.

We see no reason to hold that stockholders may not agree that interested directors may be counted toward a quorum. Such a provision does no more than to permit the directors to act as a board, leaving untouched questions of alleged unfairness or inequity that it is the duty of the courts in a proper case to resolve. Interlocking directorates are not in themselves unlawful and a provision such as here assailed, which merely facilitates the functioning of the board, cannot be said to constitute a contract contrary to public policy. The Blish decision does not announce any doctrine of public policy but merely approves a general rule of the common law. Action of interested directors under authority of such a provision will necessarily receive careful and objective scrutiny when reviewed in the courts, but this is not to say that the stockholders may not lawfully grant authority to act as a board. The Chancellor's comments on the bearing of such a charter provision upon the efficient functioning of a board of directors are pertinent. He said:

"The basis for the common law rule is the prevention of conflict between duty and self-interest or divided interest. See *Italo-Petroleum Corp. v. Hannigan*, 1 *Terry* 534, 14 *A.2d* 401. However, there are many cases where there is such a conflict and the court deals with it as here, by placing the good faith and fairness burden on those espousing the transaction. Assuming, as I have here done, that action by a quorum of directors is necessary, it would seem unrealistic to say that no action could be taken because of the inability to procure a disinterested quorum.

To adopt a rule having that effect, particularly where stockholder approval is also necessary, is merely to invite subterfuge and encourage the election of so-called dummy directors." *ante p.* 26, 89 *A.2d* 866.

This is in effect to say that such a provision may well fill a legitimate need in the efficient functioning of the corporate enterprise. We agree; and we see no basis for declaring it unlawful.

We are of opinion that at the meeting of the Mayflower directors at which the merger was approved a quorum was present. This conclusion makes it unnecessary to consider other reasons advanced by defendants in defense of the validity of the meeting.

The order of the Court of Chancery of New Castle County dated June 18, 1952, is affirmed; and the cause is remanded to that court for further proceedings in conformity with this opinion.