HUANG et al., Appellants,

v.

LANXIDE THERMOCOMPOSITES, INC. et al., Appellees.

[Cite as *Huang v. Lanxide Thermocomposites, Inc.* (2001), 144 Ohio App.3d 289.]

Court of Appeals of Ohio,
Eighth District, Cuyahoga County.

No. 77937.

Decided June 18, 2001.

*Timothy A. Shimko, Michael D. Baker* and *Carter R. Dodge,* for appellants.

*Vorys, Sater, Seymour & Pease, David J. Tocco, Bruce P. Batista* and *Amanda J. Martinsek,* for appellees.

----

ANNE L. KILBANE, Judge.

This is an appeal from an order of Judge Timothy J. McGinty, granting summary judgment in favor of appellees, Lanxide Thermocomposites, Inc. ("LTI"), its subsidiary Chiam Technologies, Inc. ("Chiam"), A.P. Green, Inc. ("Green"), Harbison–Walker Refractories Co. ("Harbison"), Global Industrial Technology Services Co. ("Global"), John Miller, William Micale, Mary Vey, Paul Hummer, and Max Aiken, on each of the shareholder derivative claims of appellants Steiner Huang, Virginia Huang, James Kane, and Richard Wessel (collectively "the Huang group"). Because the order included the disposition of claims not argued on summary judgment, we affirm in part, reverse in part, and remand.

## I. Background

In 1994 Lanxide Corp., a Delaware corporation, created a subsidiary, LTI, to develop new refractory technology for use in the steel industry. In an effort to generate income while developing its new technology, LTI entered into contracts with Chiam, formed in 1993 by the Huang group, to import Chinese refractory products, and hired Kane and Wessel. In 1995, Lanxide, in need of operating capital for LTI, entered into a loan arrangement with Green's officers, Hummer and Aiken, and in exchange for twenty percent of LTI's stock to the Huang group, Chiam became LTI's wholly owned subsidiary, Lanxide retained twenty-nine percent and Green acquired the controlling fifty-one percent of LTI's stock.

Global acquired Green in 1998 and, through Green's controlling interest, installed its employees, Micale and Vey, and Miller, an employee of Global subsidiary Harbison, as directors of LTI. Steiner Huang and Montague Claybrook, bankruptcy trustee of Lanxide, filled the remaining positions on LTI's board. By 1998, LTI had never turned a profit and owed Green approximately $9 million. Global, through Micale or Miller, informed LTI's board of directors that it decided to find a buyer for LTI, and Kane and Wessel, appointed by the board for this purpose, eventually found a potential purchaser in Enprotech, Inc. In February 1999, LTI, with the unanimous consent of the board, accepted Enprotech's letter of intent to purchase only LTI's assets, but not its stock, for approximately $2.8 million. The letter of intent included a "no-shop" provision that prevented the board from considering any other purchase offers before May 15, 1999. While the asset-only sale would result in no benefit to the shareholders, it appears that the Huang group members believed that each would retain his management position in the resulting Enprotech enterprise.

At some point after the acceptance of Enprotech's letter of intent, the Huang group members realized that continued employment in any capacity with Enprotech was doubtful, and they then attempted to organize an alternate asset-only purchase arrangement with another buyer, structured so that they would retain some type of management, employment, or eventual ownership interest in a surviving company. Rossborough Manufacturing Co. provided them with a non-binding letter of interest to participate with them in the purchase of LTI's assets under terms similar to the Enprotech proposal.

On May 14, 1999, Micale and/or Miller, on behalf of LTI, executed the actual purchase agreement with Enprotech. On June 4, 1999, LTI's directors met, discussed the Enprotech sale and the Rossborough offer, and ratified the sale of LTI's assets to Enprotech despite Steiner Huang's opposition. On June 8, 1999, the Huang group filed its shareholder derivative suit.

## II. Procedural History

In their complaint, the Huang group alleges (1) that Global and Green violated fiduciary duties to them by directing their agents, Micale, Miller and Vey, to sell LTI's assets and conduct LTI's affairs without regard to the interests of the minority shareholders; (2) that Global and Green violated duties of good faith and fair dealing to the Huang group by directing the same agents to sell LTI's assets and conduct LTI's affairs without regard to the interests of the minority shareholders; (3) that Micale, Miller, and Vey, as directors of LTI and employees of Global and/or Harbison, violated fiduciary duties owed to the minority shareholders by voting to sell LTI's assets, in failing to consider the Rossborough offer, and consummating the sale of LTI's assets to Enprotech before ratification by the LTI board of directors; (4) that Hummer and Aiken fraudulently induced the Huang group, as the former owners of Chiam, to convert Chiam into a subsidiary of LTI as part of LTI's financing arrangement with and stock transfer to Green; and (5) that all defendants acted with reckless, wanton, and willful disregard for the rights of minority shareholders, and are liable for punitive damages.

The answer contained counterclaims for, among other things, breach of fiduciary duties, violation of employment contracts, interference with business relationships, replevin, and a third-party complaint against an entity owned by Steiner and Virginia Huang called CTA. Voluminous and contentious discovery ensued with trial scheduled for March 6, 2000. On February 23, 2000, the defendants moved for leave to file a motion for summary judgment *instanter* to which the Huang group filed a brief in opposition on March 6, 2000. The judge then informally granted the motion and ordered the Huang group to submit a brief in opposition to the motion for summary judgment by March 8, 2000, a deadline they met.[1]

A journal entry dated April 19, 2000, granted the motion for leave to file the motion for summary judgment *instanter* and granted summary judgment in the defendants' favor as to all the Huang group's claims. The counterclaims and third-party claims were dismissed without prejudice by a Civ.R. 41(A)(1) notice on April 21, 2000.

## III. Analysis

The first assignment of error states:

---

1. Requiring the Huang group to file a brief in opposition to the defendants' motion for summary judgment two days after granting leave to file the motion, *instanter*, is contrary to the fourteen days provided in Civ.R. 56, but the Huang group's brief nearly mirrors the one they filed on March 6, 2000, opposing the motion for leave to file, and no error has been assigned.

"I. The trial court erred to the prejudice of appellants in granting appellee's motion for summary judgment on plaintiff's claims for fraud in the inducement and for breach of good faith and fair dealing under Delaware law."

The Huang group contends that summary judgment on counts two, four, and five of the verified complaint (breach of a duty of good faith and fair dealing, fraud in the inducement, and punitive damages, respectively) was inappropriate because these claims were not addressed in any dispositive motion below. Summary judgment shall be entered in favor of a moving party if no genuine issue as to any material fact remains to be litigated and the moving party is entitled to judgment as a matter of law.[2]

Further clarifying the burdens placed upon moving and nonmoving parties on a motion for summary judgment, the Ohio Supreme Court stated:

■ "The party seeking summary judgment always bears the initial responsibility of informing the court of the basis for the motion and identifying those portions of the record which support his or her claim. Then, and only then, is the initial burden discharged, requiring the nonmoving party to comply with Civ.R. 56(E)."[3]

■ The judge's opinion exhaustively discussed the Huang group's claims for breach of fiduciary duty in granting summary judgment "on all claims." The motion for summary judgment, however, did not dispute either the legal sufficiency, or the factual merit, of the remaining claims for fraudulent inducement and breach of the duty of good faith and fair dealing. The Huang group, therefore, was not required to satisfy any evidentiary burden to demonstrate an issue of material fact as to those claims. Accordingly, the order granting summary judgment on the claims for fraudulent inducement and breach of the duty of good faith and fair dealing, and any possible secondary claim for punitive damages based upon those claims, must be reversed. We express no opinion on the merits of any remanded claim; we merely rule that disposition of these claims must be properly determined at the trial court level before any review by this court may be had. This assignment of error has merit.

The second and third assignments of error are related:

---

2. *Welco Industries, Inc. v. Applied Cos.* (1993), 67 Ohio St.3d 344, 346, 617 N.E.2d 1129, 1131–1132; see, also, *Zivich v. Mentor Soccer Club, Inc.* (1998), 82 Ohio St.3d 367, 696 N.E.2d 201.

3. *Vahila v. Hall* (1997), 77 Ohio St.3d 421, 430, 674 N.E.2d 1164, 1171. See, also, *Sabol v. Richmond Hts. Gen. Hosp.* (1996), 111 Ohio App.3d 598, 604, 676 N.E.2d 958, 962.

"II. The trial court erred in finding as a matter of law that the sale of assets was entirely fair under the circumstances and that the defendants did not breach their fiduciary duties to the plaintiffs.

"III. The trial court erred by finding as a matter of law that there were no material facts in dispute and in concluding as a matter of law that defendants were entitled to summary judgment on all of plaintiffs' claims."

The judge's opinion analyzed the conduct of Micale, Miller, and Vey in approving the sale of LTI's assets, under the following director standard of care:

1. to act in good faith;

2. diligence in examining the transaction;

3. to obtain and act in due care on material information reasonably available, including competing offers; and,

4. to negotiate [with potential purchasers] actively and in good faith. *Paramount Communications, Inc. v. QVC Network Inc.* (Del.1994), 637 A.2d 34, 48. [4]

The Huang group contends that an incorrect standard of review of "reasonableness" was used in deciding the motion for summary judgment on their claims rooted in corporate fiduciary law. It asserts that, by virtue of the sale of LTI's assets without an accompanying transfer of all of its stock, Global acquired the ability to write off fifty-one percent of LTI's bad debt to Green, through its ownership of Green stock, and secure certain available tax benefits. The Huang group seeks to characterize Micale, Miller, and Vey as interested directors because of the employment relationship each had with either Global or Harbison. If each were so characterized, Delaware law would require an evaluation of the entire fairness of the proposed transaction with strict scrutiny and, if a material issue of fact existed, summary judgment would be precluded.[5]

While the Huang group is correct in the legal proposition that the actions of interested directors are evaluated according to a higher standard than are those of disinterested directors, they have not provided evidence that Miller, Micale, and Vey were "interested directors" as defined by Delaware law. An interested director is one who either appears on both sides of a transaction or, through the transaction, acquires a personal financial benefit not equally received by the corporation or its stockholders.[6] Since neither Micale, Miller, nor Vey

4. Opinion (Apr. 19, 2000), vol. 2453, pg. 819.

5. *Sterling v. Mayflower Hotel Corp.* (Del.1952), 93 A.2d 107, 33 Del.Ch. 293.

6. *Gries Sports Enterprises, Inc. v. Cleveland Browns Football Co., Inc.* (1986), 26 Ohio St.3d 15, 20, 26 OBR 15, 16–17, 496 N.E.2d 959, 964; see, also, *Aronson v. Lewis* (Del.1984), 473 A.2d 805, 812.

could have taken advantage of the benefit alleged (the tax advantage), and since LTI was sold to a disinterested third party with whom none of these directors had any personal connection (Enprotech), they cannot be said to be "interested" in the transaction at issue.

Additionally, the Huang group submits that the sale of LTI's assets, without an accompanying sale of stock, enabled Global, after applying the proceeds of the sale to LTI's loan from Green, to profit from a tax write-off for the remainder of that debt. It seeks to characterize Global, through its ownership of Green, as a majority shareholder who received a benefit from the transaction that did not flow equally to all stockholders. We do not agree, for two reasons.

 To accept the characterization of a possible tax write-off of approximately $7 million of LTI's now unpayable debt to Green as a "benefit" to Global, we would have to ignore the fact that, as a result of the asset-only sale, Green and/or Global surrendered the ability to ever recover the debt principal. "Fiduciary obligation does not require self-sacrifice. More particularly, it does not necessarily impress its special limitation on legal powers held by one otherwise under a fiduciary duty, when such collateral legal powers do not derive from the circumstances or conditions giving rise to the fiduciary obligation in the first instance." [7]

LTI's debt to Green was a credit asset that Global acquired through its ownership of Green before any asset sale took place. It is impossible to see the "benefit" of any tax writeoff opportunity of which Global may have eventually taken advantage. Rather, it was a legitimate way for Global to minimize its own substantial loss. This "benefit" theory ignores the fact that minority shareholders were never to be personally responsible for LTI's corporate debt and, while we do appreciate the loss suffered by the Huang group through the *de facto* corporate death of LTI, there is no particular benefit inuring to Green or Global that would place either entity, as a shareholder, on a footing different from that of the minority shareholders. One hundred percent of LTI's stock is now worthless, not just the twenty percent owned, collectively, by the Huang group.

 Second, Global, through only the LTI/Green debt and not as a shareholder, received the entire $2.8 million that Enprotech paid for LTI's assets. Green was not required to subordinate its interests as a creditor of LTI merely because it was also a stockholder. "Thus, one who may be both a creditor and a fiduciary (e.g. a director or controlling shareholder) does not by reason of that status alone have special limitations imposed upon the exercise of his or her creditors'

---

7. *Odyssey Partners, L.P. v. Fleming Cos., Inc.* (Del. Ch.1999), 735 A.2d 386, 415.

rights."[8] Consequently, the disposition of the proceeds of LTI's asset sale does not place a heightened burden upon the defendants to prove the entire fairness of the transaction.

It is true that Global may have dominated LTI's board of directors through Micale, Miller, and Vey; however, neither Global nor any director, through any influence on the ultimate decision, received a benefit to the detriment of minority shareholders. "[The Delaware] Supreme Court has made it quite clear that the heightened judicial scrutiny called for by the test of intrinsic or entire fairness is not called forth simply by a demonstration that a controlling shareholder fixes the terms of a transaction and, by exercise of voting power or by domination of the board, compels its effectuation * * *. It is in each instance essential to show as well that the fiduciary has an interest with respect to the transaction that conflicts with the interests of minority shareholders."[9] Accordingly, no circumstance exists that would place a heightened duty upon either Global, Micale, Miller, or Vey to show that the transaction was entirely fair under all the circumstances. The second assignment of error is not well taken.

The Huang group alleges, in its third assignment of error, a breach of fiduciary duty in connection with the sale of LTI's assets and in the way it may have been hindered or improperly conducted. Specifically, they assert that the board, through Micale and Miller, misrepresented LTI's financial prospects to purchasers of stock as opposed to assets, implying an ability to take advantage of the tax breaks associated with an asset sale rather than a stock transfer. They also assert that, in entering into a binding letter of intent with Enprotech containing a no-shop clause, and in executing a purchase agreement before the board finally voted on the sale, the board frustrated the Huang group's ability to make an effective counteroffer in soliciting Rossborough as another potential buyer.

Generally, the management of the business and affairs of a Delaware corporation is entrusted to its directors, who are the duly elected and authorized representatives of the stockholders.[10] Under normal circumstances, the business judgment rule mandates deference to directors' decisions, presuming "that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."[11] However, the sale of assets here is considered an

**8.** *Id.*

**9.** *Jedwab v. MGM Grand Hotels, Inc.* (Del.Ch.1986), 509 A.2d 584, 594–595, *citing Sinclair Oil Corp. v. Levien* (Del.1971), 280 A.2d 717.

**10.** Del.Code Ann., Section 141(a), Title 8.

**11.** *Aronson v. Lewis* (Del.1984), 473 A.2d 805, 812

extraordinary transaction and "subjects the directors' conduct to enhanced scrutiny to ensure that it is reasonable." [12]

 "The key features of an enhanced scrutiny test are: (a) a judicial determination regarding the adequacy of the decisionmaking process employed by the directors, including the information on which the directors based their decision; and (b) a judicial examination of the reasonableness of the directors' action in light of the circumstances then existing. The directors have the burden of proving that they were adequately informed and acted reasonably.

"* * *

 "[A] court applying enhanced judicial scrutiny should be deciding whether the directors made a reasonable decision, not a perfect decision. If a board selected one of several reasonable alternatives, a court should not second-guess that choice even though it might have decided otherwise or subsequent events may have cast doubt on the board's determination. Thus, courts will not substitute their business judgment for that of the directors, but will determine if the directors' decision was, on balance, within a range of reasonableness." [13]

 When deciding to sell the assets or control of a company, the governing board of directors has a fiduciary duty to obtain the best value reasonably available to the shareholders. [14]

 The role of this court is to determine whether the Huang group has demonstrated a material issue of fact as to whether the board of LTI made an adequately informed, reasonable decision in deciding to sell LTI's assets. The board, faced with an immediate lack of capital such that LTI's ability to meet its payroll was in doubt and a mass exodus of key employees due to the uncertain status of the company, accepted a firm, cash-in-hand purchase offer from Enprotech. In doing so, it rejected a proposal from the inside-management Huang group who were supported by an exploratory, non-binding letter of interest from Rossborough. Since, in the judgment of the board, a rejection of the Enprotech proposal may have placed that very opportunity in doubt, we cannot find that there is any material issue of fact as to the reasonableness of the board's decision. A board of directors is required to make a reasonable decision, not a perfect one. [15]

---

12. *Paramount Communications, Inc. v. QVC Network Inc.* (Del.1994), 637 A.2d 34, 42.

13. *Id.* at 45.

14. *Id.* at 48, citing *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.* (Del.1986), 506 A.2d 173.

15. *Paramount* at 45.

In evaluating the board's decision, we also note that, prior to voting on the Enprotech proposal, the board considered, on the record, all of the advantages and liabilities of both the Enprotech and Rossborough offers. It concluded that Enprotech presented the only solid offer because it was based on an already-executed purchase agreement and was equal to or better than the Rossborough offer in terms of price. Since the Rossborough proposal was conditioned on a due diligence review of LTI's corporate records, the board determined that Rossborough's interest was not concrete. We find no material dispute of fact as to these findings based upon the circumstances that existed at the time of the vote. This determination, however, is not dispositive of the ultimate question of whether Micale, Miller, and Vey fulfilled their fiduciary duties as directors of LTI.

While the Huang group asserts various misdeeds on the part of Micale and Miller in reference to their discouraging selected potential purchasers and in hastily changing LTI's financial statements to make its stock seem less attractive, they present no concrete evidence supporting such claims. The Huang group relies on the affidavit of Wessel, which does nothing more than attest to conclusory allegations that mirror those contained in the verified complaint. We conclude that there is no evidence showing misconduct of Micale and Miller in the events culminating in this suit.

■ The Huang group is correct that no-shop provisions in corporate purchase agreements may, at times, be deemed unenforceable. "Such provisions, whether or not they are presumptively valid in the abstract, may not validly define or limit the directors' fiduciary duties under Delaware law or prevent the [selling] directors from carrying out their fiduciary duties under Delaware law. To the extent such provisions are inconsistent with those duties, they are invalid and unenforceable." [16]

While *Paramount Communications, Inc. v. QVC Network, Inc., supra,* mandates enhanced scrutiny in determining whether the no-shop provision or the possible premature sale to Enprotech impermissibly impaired the LTI board's ability to attain the best available result for all of its shareholders, we note that, because of the financial condition of LTI, earlier attempts to sell the stock of the corporation were unsuccessful. An asset-only sale could never inure to the benefit of any LTI shareholder unless the price was in excess of LTI's debt, or roughly $9 million, which was not realistic or obtainable. Assuming, *arguendo,* that the board had waited for the Rossborough letter of interest to develop into an asset-purchase agreement, no LTI shareholder would have received any benefit because each would have still been left with the worthless stock in LTI's debt-ridden, non-operating shell. We cannot conclude that the Haung group has

---

16. *Paramount* at 48.

presented a question of material fact that would preclude summary judgment for Micale, Miller, and Vey on the breach of fiduciary duty claims asserted in connection with the sale of LTI's assets to Enprotech. The third assignment of error is overruled.

## IV. Conclusion

We reverse the grant of that part of the summary judgment directed to the Huang group's claims for fraudulent inducement and breach of the duty of good faith and fair dealing against Green, Hummer, and Aiken.

*Judgment affirmed in part,*
*reversed in part*
*and cause remanded.*

TIMOTHY E. MCMONAGLE, P.J., concurs.

MICHAEL J. CORRIGAN, J., concurs in judgment only.